## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ROME DIVISION

| | |
|---|---|
| REMI MARTEL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CIVIL ACTION FILE NO.: |
| | ) |
| THE CITY OF BRASWELL, JOSEPH | ) **JURY TRIAL DEMANDED** |
| JEFFERSON, individually, MICHAEL | ) |
| KENNY, individually, MARQUTTE | ) |
| SIMMONS, individually, and A. TYLER | ) |
| BETSILL, individually, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## COMPLAINT

Plaintiff Remi Martel ("Martel"), by and through his undersigned counsel, states his Complaint against Defendants the City of Braswell, Joseph Jefferson, individually, Michael Kenny, individually, Marqutte Simmons, individually, and A. Tyler Betsill, individually, as follows:

## INTRODUCTION

1.      Martel aspired to be the mayor of the City of Braswell, Georgia (the "City" or "Braswell"). Martel has long been a public servant, having served as a law enforcement officer since 2012. More than seven of those years were spent with the

1

Braswell Police Department ("Braswell PD" or "Department") where he obtained the rank of lieutenant before he voluntarily resigning in January of 2025.

2.      In April 2025, Martel filed his paperwork to officially declare his candidacy to run for the mayor of the City.

3.      On May 6, 2025, his candidacy was announced at Braswell's City Council meeting, which was attended by Defendant Joseph Jefferson, the Chief of Police for the Braswell PD.

4.      Defendant Jefferson understood that if Martel became Mayor, Martel would bring accountability to the Braswell PD, and Defendant Jefferson believed this would lead to his termination.

5.      Defendant Jefferson and the Braswell PD were intent on preventing Martel from winning the election. So intent, they engaged in a systematic, multi-month campaign to violate Martel's civil and constitutional rights—turning the violation of Martel's constitutional rights into the official policy of the Braswell PD. These violations ranged from shutting down Martel's campaign event, issuing baseless citations against him, falsely telling his new employer that he was on the Brady list, reporting to the Georgia Peace Officer Standards & Training Council ("Georgia POST") that he had been terminated four months after reporting he had voluntarily resigned, submitting baseless complaints to his new employer, and stalking his home. Defendant Jefferson and his co-defendants were relentless.

6.     For this, Defendants are liable.

## PARTIES, JURISDICTION, AND VENUE

7.     Plaintiff Martel is an individual residing in Paulding County, Georgia.

8.     Defendant City of Braswell is a municipal governmental entity that may be served with summons and process at 6997 Braswell Mountain Rd., Braswell, GA 30153, through its mayor, Richard Fennell.

9.     Defendant Joseph Jefferson resides in this District and is a citizen of the State of Georgia. He is sued in his individual capacity.  Defendant Jefferson may be served with summons and process at 6997 Braswell Mountain Rd., Braswell, GA 30153.

10.    Defendant Michael Kenny resides in this District and is a citizen of the State of Georgia. He is sued in his individual capacity. Defendant Kenny may be served with summons and process at 6997 Braswell Mountain Rd., Braswell, GA 30153.

11.    Defendant Marqutte Simmons resides in this District and is a citizen of the State of Georgia. He is sued in his individual capacity.  Defendant Simmons may be served with summons and process at 6997 Braswell Mountain Rd., Braswell, GA 30153.

12.    Defendant A. Tyler Betsill resides in this District and is a citizen of the State of Georgia. He is sued in his individual capacity.  Defendant Betsill may be

served with summons and process at 6997 Braswell Mountain Rd., Braswell, GA 30153.

13.    This matter arises under the laws and Constitution of the United States, namely 42 U.S.C. § 1983 for the deprivations of Martel's rights under the United States Constitution, and thus this Court has federal question jurisdiction over this matter pursuant to 28 U.S.C. § 1331.

14.    The Court has supplemental jurisdiction over Martel's state law claims pursuant to 28 U.S.C. § 1367(a) because his claims for defamation are so factually related to his claims under 42 U.S.C. § 1983 such that it forms part of the same case or controversy under Article III of the United States Constitution.

15.    Defendants are residents of this District, a substantial part of the events giving rise to his claims occurred in this District, and all Defendants perform their governmental functions in this District.

16.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1)-(2) and 1391(c)(1)-(2).

## FACTUAL BACKGROUND

17.    Martel is a law enforcement officer currently employed by the police department of the City of Emerson, Georgia ("Emerson PD").

18.    Martel has served as a law enforcement officer since 2012.

19.    Martel has never left a law enforcement agency after being terminated.

20.    Martel previously served as a lieutenant for the police department of Braswell PD, until he voluntarily resigned on January 28, 2025—after having been with the department since April 2018.

21.    In January 2025, Martel resigned from the Braswell PD in response to retaliation by his colleagues after Martel had submitted several internal complaints in 2024 and 2025, and in response to the Braswell PD's failure to reasonably investigate said complaints and instead subject Martel to an internal investigation.

a. **The Braswell PD Reported a Manufactured Termination to Georgia POST**

22.    In or around January 2025, the Braswell PD reported to Georgia POST that Martel had voluntarily resigned from his position with the Braswell PD.

23.    Georgia POST is the state's regulatory body responsible for certifying and disciplining peace officers, holding the power to revoke an officer's career and livelihood based on reported misconduct. Because the Georgia POST relies on accurate information to maintain the integrity of law enforcement, false statements made to Georgia POST can cause irreparable professional damage and result in permanent disqualification from law enforcement through the revocation of an officer's POST certification.

24.    On April 17, 2025, Martel filed with the City of Braswell his notice of candidacy to run for Mayor of Braswell.

25.    On May 6, 2025, Martel attended a Braswell City Council meeting where it was publicly announced that he was running for mayor. Defendant Jefferson was in attendance.

26.    The election was scheduled for November 4, 2025.

27.    Defendant Jefferson has admitted that he was concerned that if Martel became Mayor, Martel would "terminate" him from his position as Chief of the Braswell PD.

28.    By May 9, 2025, Defendants Jefferson and Simmons knew that Martel was voicing criticism of Defendant Jefferson and the Braswell PD.

29.    By May 9, 2025, Defendant Jefferson—who is imbued with final decision making authority for the Braswell PD—put into action the official policy, practice, pattern, and custom of the Braswell PD of attempting to prevent Martel from becoming mayor, which included the intentional interference with Martel's First Amendment rights and attempting to damage his professional and personal standing.

30.    On May 9, 2025, while acting under color of state law, Defendant Jefferson drafted a notice purporting to rescind his decision to allow Martel to resign, stating that Martel's status was "terminated."

31.     Defendant Jefferson maliciously manufactured this termination in furtherance of the Braswell PD's campaign to prevent Martel from becoming mayor and to retaliate against him for exercising his First Amendment rights.

32.     On May 14, 2025, while acting under color of state law, Defendant Jefferson and Defendant Simmons spoke with a Georgia POST investigator and demanded that Martel's separation status be changed from a voluntary resignation to a termination.

33.     Defendant Jefferson and Defendant Simmons told the Georgia POST investigator that Martel was terminated from his employment based on an alleged issue with at least 13 police reports. That purported issue involved police reports by one of Martel's direct reports in 2024. And the issue was resolved in 2024 with no discipline against Martel—let alone termination.

34.     Driving home that Defendant Jefferson, Defendant Simmons, and Defendant City of Braswell manufactured this termination, they failed to provide the Georgia POST investigator with the alleged reports as requested.

35.     Despite the manufactured nature of the termination, by May 14, 2025, Defendant Jefferson, Defendant Simmons, and Defendant City of Braswell succeeded in having Martel's job status with Georgia POST changed from voluntary resignation to termination—leaving a permanent professional stain on Martel.

36.    Defendant Jefferson, Defendant Simmons, and Defendant City of Braswell triggered a Georgia POST investigation into Martel, which involved communicating with Martel about the accusations.

### b. The Braswell PD Attempts to Prevent Martel from Being Hired by the Emerson PD

37.    In April and May of 2025, Martel was in the process of securing employment as a law enforcement officer with the Emerson PD.

38.    After May 9, 2025, acting under color of state law, Defendant Jefferson and Defendant Simmons spoke with the Emerson PD's background investigator, and as the investigator put it, "Neither of them had any kind words for Martel." Defendant Jefferson even relayed an alleged incident involving Martel from 2015 when he provided a crime victim with shelter for one night, despite there never having been any finding of wrongdoing by Martel. As the background investigator reported, "no documentation was done to record the details of said incident" by the Braswell PD.

39.    Defendant Jefferson and Defendant Simmons knowingly made false statements to the background investigator, including that Martel was attempting to get people to sign a petition to have Defendant Jefferson and Mayor Fennell removed from office.

40.    Defendant Jefferson and Defendant Simmons made their statements to the background investigator, including knowingly false statements, in furtherance of

the Defendant Jefferson, Defendant Simmons, and the Braswell PD's campaign against Martel to prevent him from becoming mayor and in retaliation for Martel exercising his First Amendment rights. The intent was to maliciously harm Martel.

41.    Despite Defendant Jefferson and Defendant Simmons's efforts, Martel was hired by the Emerson PD—where he has worked for 11 months without incident.

### c. **The Braswell PD's Rejected June 2025 Attempt to Have Martel Disciplined by the Emerson PD**

42.    Undeterred, the Braswell PD continued its campaign to intimidate and harass Martel—then a mayoral candidate.

43.    On June 3, 2025, Braswell PD Officer Plummer filed an internal report alleging, *inter alia*, that Martel had made disparaging statements about Defendant Jefferson at the scene of a Polk County vehicle accident and that Martel had interfered with the accident investigation.

44.    On June 16, 2025, the Emerson PD was given two letters from the Braswell PD about the alleged June 3 incident: a letter from Officer Plummer and a letter from Defendant Simmons.

45.     This resulted in the Emerson PD conducting an investigation. During the course of the investigation, the Emerson PD attempted to gather objective evidence, rather than simply rely on the letters of the Braswell PD.

46. For instance, the Emerson PD repeatedly requested that Defendant Simmons provide video of the alleged incident, and Defendant Simmons dragged his feet. At one point, Defendant Simmons chastised the Emerson PD investigator for pursuing objective evidence and questioned why Officer Plummer's report was not sufficient for Emerson PD to discipline Martel.

47. Defendant Simmons ultimately stated that the Braswell PD did not have any video evidence of the alleged incident, and he provided only still pictures and a short video clip from the Polk County Police Department's footage. This stands to reason, as Defendant Simmons, Defendant Jefferson, and the Braswell PD were aware that their accusations was baseless.

48. The Emerson PD investigator was left with having to obtain the actual video footage of the alleged incident from the Polk County Police Department.

49. As part of the investigation, Martel was informed that Defendant Jefferson, Defendant Simmons, and the Braswell PD were making accusations about him, and he was asked about the truth of the accusations.

50. After reviewing the video, the Emerson PD investigator did not observe that Martel had interfered with the investigation into the vehicle accident—contrary to the misrepresentations by the Braswell PD. And despite the Braswell PD's efforts, Martel received no discipline.

51.     Defendant Jefferson, Defendant Simmons, and the Braswell PD made this false report to the Emerson PD in furtherance of the Braswell PD official policy, pattern, practice, and custom of violating Martel's First Amendment rights, and retaliating against him for the exercise of such rights, including by damaging him personally, politically, and professionally.

### d.  **The Braswell PD Baselessly Shuts Down Martel's Campaign Event**

52.     On September 1, 2025, Martel held an event at his private home to kick off his campaign for Mayor of Braswell ("Campaign Event").  It was purely a political event with approximately 20 guests by the time Defendant Betsill and Defendant Kenny showed up to shut it down.

53.     This event was a family friendly gathering, with a bounce house as pictured below:





54.     There was nothing unlawful occurring at the Campaign Event: e.g., there was no alcohol; there was no loud noise; nothing was being built; nothing was being manufactured; nothing was being sold; no one was fighting; no one was yelling; no one was making threats; no one was plotting or executing an unlawful enterprise or to assist another person in an unlawful enterprise, let alone one that would be executed with force or violence.

55.     Defendant Jefferson, Defendant Betsill, Defendant Kenny and the Braswell PD has no basis whatsoever to suspect that any criminal conduct was underway.

56.    It was a political event with potential voters, not a commercial event. Martel and his supporters were simply engaging in the core First Amendment conduct of political speech, all while children jumped in a bounce house.

57.    In furtherance of the Braswell PD's official policy, pattern, practice, and custom of violating Martel's First Amendment rights, and retaliating against him for the exercise of such rights, including by damaging him personally and professionally, and acting under color of state law, Defendant Jefferson ordered Defendant Betsill and Defendant Kenny to shut down the Campaign Event and to issue citations to Martel.

58.    Defendant Jefferson did not even attempt to hide that he was behind it. He told a Polk County election official that he would shut down the Campaign Event. The Polk County election official warned Defendant Jefferson against engaging in this unlawful act, but Defendant Jefferson was intent on violating Martel's First Amendment rights.

59.    Despite the lawful nature of the Campaign Event, acting under color of state law, at the direction of Defendant Jefferson, and in furtherance of the Braswell PD's official policy, custom, pattern, and practice, Defendant Betsill and Defendant Kenny issued two citations to Martel under Braswell Ordinances 3-58 LICENSE PERMIT UNLAWFUL and 3-60 UNLAWFUL ASSEMBLY.

14

60.     Martel did not violate these ordinances or any other law in connection with the campaign event, which is why the case against him was dismissed within 10 days without Martel ever having to appear in court.

61.     Braswell Ordinance 3-58 LICENSE PERMIT UNLAWFUL was not even an active ordinance. It is merely described as "PENDING," with a void of language as to what is purportedly unlawful under the ordinance.

62.     Braswell Ordinances 3-60 UNLAWFUL ASSEMBLY provides as follows:

> A disturbance of the public peace by three or more persons who meet together with an intent mutually to assist each other in the execution of some unlawful enterprise of a private nature, with force and violence; if they move forward towards its execution, it is then a rout and if they actually execute their design, it amounts to a riot.

63.     Despite the lawful nature of the Campaign Event, acting under color of state law, at the direction of Defendant Jefferson, and in furtherance of the Braswell PD's official policy, custom, pattern, and practice, Defendant Betsill and Defendant Kenny also required that Martel shut down his campaign event, and they drove down his cul-de-sac several additional times that day to continue to intimidate Martel and ensure that Martel could not continue his campaign event.

64.     In undertaking this action, Defendant Betsill and Defendant Kenny walked onto Martel's private property and asked for Martel's identification (which Martel obliged). The encounter took several minutes, Martel did not feel free to

15

leave, and Martel in fact submitted to Defendant Betsill and Defendant Kenny's authority, remaining at the end of driveway where they accosted him.

65.     Defendant Betsill and Defendant Kenny undertook this activity in furtherance of the Braswell PD's official policy, custom, pattern, and practice, to violate Martel's First Amendment rights and to retaliate against Martel for exercising his First Amendment rights—particularly Martel's political speech and conduct, including his public criticism of Defendant Jefferson and Mayor Fennell, and Martel's candidacy for Mayor.

66.     By September 10, 2025, the baseless citations issued to Martel were dismissed, but the damage had been done, including blatant infringement of Martel's First Amendment rights, the loss of his expenses for the event, and damage to his personal, political, and professional reputation.

67.     Ultimately, Martel did not win the election to be Mayor of Braswell.

### e.  **The Braswell PD Continued Making False Statement About Martel**

68.     On or around October 8, 2025, Defendant Kenny sent the following Facebook message to Emerson Mayor Bo Jordan:



Bo Jordon ,
Hey sir , some information was passed onto me about one of your Officers. (Remi Martel) He's currently running for mayor for the city of Braswell , in a very negative way . And the city knows that he is an officer with Emerson . He is being very negative about the Braswell Police Dept and him being an Emerson police officer doesn't look good on his part ! Officer Martel is also on the Ga Brady list . Remi Martel was an officer with the city of Braswell and was dismissed for untruthfulness . I wanted you to be aware of the situation sir .
M.kenny

69.     The "GA Brady list" is a reference to a list that is maintained by prosecutors of law enforcement officers who have a documented history of dishonesty, bias, or other misconduct that could undermine their credibility in court. When a law enforcement officer is on a Brady list, prosecutors virtually and categorically will not call that officer to testify. This means said officer cannot perform a fundamental aspect of the job and will generally be fired and is virtually un-hirable.

70.     Defendant Kenny's Facebook message was false on many fronts.

71.    Setting aside that there is no centralized Georgia Brady list, Martel has never been on any Brady list.

72.    Defendant Kenny manufactured the Brady list accusation from whole cloth in furtherance of the policy and campaign to retaliate against Martel for exercising his First Amendment rights.

73.    The Facebook message also falsely stated that Martel was terminated from the Braswell PD for untruthfulness—which Defendant Kenny fabricated from whole cloth.

74.    As Defendant Kenny knew, (1) that Martel voluntarily resigned from the Braswell PD, and (2) that even when the Braswell PD falsely changed Martel's status to "terminated" four months later, it was not on the basis of untruthfulness.

75.    Defendant Kenny sent this Facebook message with the malicious intent to injure Martel, including to get Martel disciplined or terminated on the basis of falsehoods.

76.    Then, on November 7, 2025, Defendant Jefferson sent the following email riddled with falsehoods to Emerson PD's Chief of Police:

18

## Gmail

Kyle Teems <kteems@cityofemerson.org>

---

**Remi Martel**

Emerson, GA <noreply@civicplus.com>                                    Fri, Nov 7, 2025 at 8:58 AM
Reply-To: jjefferson@braswellga.org
To: kteems@cityofemerson.org

Name: Joseph Jefferson
Email: jjefferson@braswellga.org

Message:

Good morning Chief Teems, my name is Chief Jefferson of the Braswell Police Department. I will not take much time away from your day, but there are a few issues that I would like to bring to your attention.

As you are probably aware, former officer Remi Martel ran for mayor here in Braswell and was defeated. He has obviously taken it extremely hard and is definitely upset that I terminated him. It has been brought to my attention that he said he ran for mayor in hopes of winning so that he could do what he thought he could do, and that was to terminate me.

However Chief, I'm not writing to ask you to address the issues he's attempting to take against me, but to address the issues that my administrations staff members have with martel.

My city clerk advised me on yesterday that she's feeling intimidated by martel , because of the negativity and outrageous actions he's posting online against the city and it's officials. She often times arrives at the office much earlier than the rest of my staff does.

On one occasion, martel drove his city issued patrol vehicle to city hall on his personal time (video on file) during the night and took video footage of himself measuring distances from city hall to across the street.

On another occasion, my Internal Affairs Sgt advised me a few weeks ago that martel was speeding back and forth following her in his city issued vehicle and yelling out the window at her as she distributed literature to the residents.

As I stated before I'm not concerned with what he may or may not say about myself and city officials, but I'm very concerned about my admin staff feeling safe and not feeling intimidated by his actions.

Chief, I would most definitely appreciate any assistance you can provide in resolving this issue with Remi Martel and his negativity against the city of Braswell.

Thank you for you're time and if I can be of any service to you, please do not hesitate to contact me.


Regards,


Chief Jefferson
Braswell Police Department
6997 Braswell Mountain Rd.
Braswell GA. 30153
Office ph  770.684.7979
Cell ph 404.790.0149
Email:jjefferson@braswellga.org

77.    The email's false accusations against Martel include: (1) that Defendant Jefferson terminated Martel's employment; (2) that Martel had been intimidating the Braswell Clerk, including based upon social media posts that MartelMatel did not in

19

fact author; (3) that Martel had been speeding back and forth following a Braswell PD internal affairs Sergeant; and (4) that Martel had been intimidating other Braswell officials.

78.     These are false accusations: (1) Martel was not terminated from his employment with the Braswell PD, but instead had voluntarily resigned; (2) Martel has not been intimidating Braswell Clerk or other City officials, including based upon social media posts; and (3) Martel had not been speeding back and forth following a Braswell PD internal affairs Sergeant.

79.     Defendant Jefferson actually knew that Martel had voluntarily resigned and that the purported termination was manufactured by Defendant Simmons and himself four months after Martel left the Braswell PD.

80.     Upon information and belief, Defendant Jefferson manufactured from whole cloth that Martel had been intimidating the Braswell officials and had been speeding back and forth following a Braswell PD internal affairs Sergeant. Indeed, these false accusations are part of Defendant Jefferson and the Braswell PD's pattern and practice of using falsehoods to maliciously and intentionally violate Martel's First Amendment rights and to otherwise injure him personally and professionally.

81.      Beyond the above, throughout Martel's mayoral campaign, his signs in the City were consistently being destroyed. Upon information and belief, this

destruction was at the hands of the Braswell PD in furtherance of its policy and campaign to harm Martel and otherwise violate his First Amendment rights.

### f. The Braswell PD Stalked Martel

82. Acting under color of state law and in furtherance of the official policy to violate Martel's First Amendment rights, the Braswell PD, at the direction of Defendant Jefferson, stalked Martel.

83. For instance, on election day, November 4, 2025, a Braswell PD police cruiser drove around Martel's cul-de-sac at least 9 times despite the absence of any criminal activity occurring in the quiet cul-de-sac.

84. Between May 6, 2025, and November 2025, on at least three other occasions, a Braswell PD police cruiser drove around Martel's cul-de-sac to stare him down, despite the absence of any criminal activity occurring in quiet cul-de-sac.

85. The message was clear: the Braswell PD, at the direction of Defendant Jefferson, was threatening Martel and wished to put him in fear for his personal safety.

### g. The Braswell PD's Official Policy, Practice, Pattern, and Custom to Violate Martel's Constitutional Rights

86. The above-described conduct was not the product of isolated decisions by rogue officers. It was the product of an official policy, custom, pattern, and practice of the Braswell PD to violate Martel's First Amendment rights, to retaliate

21

against him for exercising those rights, and to prevent him from being elected Mayor of Braswell.

87. Defendant Jefferson is, and at all relevant times was, the Chief of Police of the Braswell PD. In that capacity, Defendant Jefferson is the final policymaking authority for the Braswell PD with respect to the supervision, direction, deployment, discipline, internal investigations, external communications, and operational decision-making of its officers, including with respect to the conduct described in this Complaint.

88. Defendant Jefferson exercised that final policymaking authority to establish, direct, and effectuate a coordinated, sustained campaign by the Braswell PD against Martel from at least May 6, 2025 forward—the date on which Martel's candidacy for Mayor of Braswell was announced at the City Council meeting that Defendant Jefferson attended.

89. The motive for this official policy, custom, pattern, and practice was openly acknowledged by Defendant Jefferson, who admitted his concern that if Martel were elected Mayor, Martel would terminate him from his position as Chief of the Braswell PD. The official policy, custom, pattern, and practice was therefore designed to: (a) prevent Martel from being elected Mayor; (b) retaliate against Martel for exercising his First Amendment right to run for office and to publicly criticize Defendant Jefferson and the Braswell PD; (c) damage Martel's professional

22

standing and law enforcement career; and (d) intimidate Martel and chill his protected political speech and association.

90.    The existence of this official policy, custom, pattern, and practice is evidenced by the Braswell PD's persistent, widespread, and coordinated course of conduct against Martel, including:

a. On May 9, 2025—three days after Martel publicly announced his candidacy—Defendant Jefferson personally sent a notice purporting to retroactively rescind his prior acceptance of Martel's voluntary resignation and falsely reclassify Martel's separation status as "terminated," four months after Martel had in fact voluntarily resigned;

b. On May 14, 2025, Defendant Jefferson and Defendant Simmons contacted Georgia POST and demanded that Martel's separation status be changed from voluntary resignation to termination, in an effort to revoke or impair Martel's POST certification and end his law enforcement career;

c. In and around May 2025, Defendant Jefferson and Defendant Simmons spoke with the Emerson PD's background investigator in an effort to prevent Martel's hiring, including by relaying a stale and undocumented allegation from 2015 that had never resulted in any finding of wrongdoing;

23

d. On June 16, 2025, the Braswell PD submitted two letters to the Emerson PD—from Officer Plummer and Defendant Simmons—containing false accusations that Martel had disparaged Defendant Jefferson and interfered with a Polk County accident investigation, in an effort to have Martel disciplined or terminated by his new employer;

e. When the Emerson PD sought objective video evidence of the alleged June 3 incident, Defendant Simmons resisted, delayed, withheld available footage, and chastised the Emerson PD investigator for not simply accepting Officer Plummer's written report as a basis for discipline against Martel;

f. On September 1, 2025, Defendant Jefferson personally directed Defendant Betsill and Defendant Kenny to shut down Martel's lawful Campaign Event at his private home and to issue two baseless citations to Martel—one under a non-existent "PENDING" ordinance (3-58) and another under an inapplicable unlawful-assembly ordinance (3-60)—despite a Polk County election official having warned Defendant Jefferson in advance that doing so would be unlawful;

g. After shutting down the Campaign Event, Braswell PD officers, at Defendant Jefferson's direction, repeatedly drove down Martel's cul-

de-sac the same day to intimidate Martel and his supporters and to ensure the Campaign Event could not resume;

h. On October 8, 2025, Defendant Kenny, acting under color of state law, sent a Facebook message to Emerson Mayor Bo Jordan falsely stating that Martel was on a "GA Brady list" and that Martel had been dismissed from the Braswell PD for "untruthfulness"—accusations fabricated from whole cloth and calculated to mislead the Emerson PD into terminating Martel;

i. On November 4, 2025 (election day), a Braswell PD police cruiser drove around Martel's cul-de-sac at least nine times despite the absence of any criminal activity, in a direct effort to intimidate Martel and chill his exercise of his First Amendment rights on the day of the election;

j. On at least three additional occasions during this period, a Braswell PD police cruiser drove around Martel's cul-de-sac to stare him down, despite the absence of any criminal activity;

k. On November 7, 2025—three days after the mayoral election— Defendant Jefferson personally sent an email to the Emerson PD Chief of Police containing multiple false or misleading accusations against Martel, including that Defendant Jefferson had terminated Martel's employment (despite Martel having voluntarily resigned), that Martel

had intimidated the Braswell Clerk and other City officials, and that Martel had been speeding back and forth following a Braswell PD internal affairs Sergeant; and

l. Throughout the mayoral campaign, Martel's campaign signs in the City were systematically destroyed; upon information and belief, this destruction was done by or at the direction of the Braswell PD in furtherance of its campaign against Martel.

91. The above course of conduct was not random, episodic, or attributable to the independent judgment of individual officers. It was a sustained, multi-month campaign carried out by multiple Braswell PD officers across multiple ranks—including the Chief of Police (Defendant Jefferson), a Captain (Defendant Simmons), and patrol officers (Defendant Betsill, Defendant Kenny, and Officer Plummer)—each acting in coordination with and at the direction of Defendant Jefferson.

92. Defendant Jefferson personally participated in, directed, authorized, and approved each material component of this campaign. Among other things, Defendant Jefferson personally sent the false "termination" notice; personally communicated with Georgia POST to falsely report Martel as terminated; personally spoke with the Emerson PD's background investigator in an effort to prevent Martel's hiring; personally directed the shutdown of the Campaign Event and the

26

issuance of the baseless citations; and personally sent the November 7, 2025 email to the Emerson PD Chief of Police. Each of these acts, having been taken by the final policymaker for the Braswell PD, itself constitutes the official policy of the Braswell PD.

93.    Independently of Defendant Jefferson's direct participation, Defendant Jefferson ratified each act of his subordinates that comprised the Braswell PD's campaign against Martel. As the final policymaking authority for the Braswell PD, Defendant Jefferson had the opportunity to review each of his subordinates' decisions and the bases for those decisions, and Defendant Jefferson approved of both the decisions and the bases for them.

94.    Defendant Jefferson's ratification of his subordinates' conduct is not premised on a single isolated incident or a single failure to investigate. To the contrary, the conduct of Defendant Simmons, Defendant Betsill, Defendant Kenny, and Officer Plummer described above was openly and repeatedly carried out over a multi-month period within a small police department headed by Defendant Jefferson, and the conduct was directly and unavoidably known to Defendant Jefferson at the time it occurred.

95.    With respect to Defendant Simmons's May 14, 2025 communications with Georgia POST falsely reporting Martel as terminated, Defendant Jefferson had the opportunity to review and approve that conduct and its basis, did review and

27

approve it, and joined in it—including by personally communicating with Georgia POST to the same false effect and by sending the May 9, 2025 notice on which the false report was premised.

96. With respect to Defendant Simmons's and Officer Plummer's June 16, 2025, letters that were provided to the Emerson PD, Defendant Jefferson had the opportunity to review and approve the decision to send those letters and the bases for them, did review and approve them, and authorized their transmission as official communications of the Braswell PD. Defendant Jefferson took no corrective action when the Emerson PD's independent investigation determined that the accusations were meritless.

97. With respect to Defendant Betsill's and Defendant Kenny's September 1, 2025, shutdown of the Campaign Event and issuance of the baseless citations, Defendant Jefferson personally directed the underlying conduct and, after the citations were dismissed within ten days, took no corrective action, imposed no discipline, and instead permitted the same officers to continue surveilling Martel's home in the weeks and months that followed.

98. With respect to Defendant Kenny's October 8, 2025, Facebook message to Emerson Mayor Bo Jordan, Defendant Jefferson had the opportunity to review and approve that conduct and its basis, did so, and ratified it both by failing to discipline Defendant Kenny and by himself sending the November 7, 2025 email

28

to the Emerson PD Chief of Police repeating and amplifying many of the same category of false accusations against Martel.

99. With respect to the surveillance of Martel's cul-de-sac by Braswell PD officers on election day and on multiple other occasions, that conduct was carried out in marked Braswell PD cruisers, was visible to Defendant Jefferson through ordinary departmental operational reporting, and could only have been authorized or permitted by Defendant Jefferson, who controls the deployment of Braswell PD officers and cruisers. Defendant Jefferson approved of the surveillance, took no steps to stop it, and imposed no discipline on the officers who carried it out.

100. At no point did Defendant Jefferson investigate, discipline, retract, or correct any of the false statements, baseless citations, or acts of intimidation described above—conduct that any reasonable law enforcement agency, headed by any reasonable chief, would have investigated and corrected. Defendant Jefferson's persistent failure to do so over a multi-month period, in the context of a coordinated campaign that he himself initiated and directed, reflects his agreement with both the decisions of his subordinates and the bases for those decisions.

101. Defendant Jefferson's ratification of the conduct of Defendant Simmons, Defendant Betsill, Defendant Kenny, and Officer Plummer is itself an act of the final policymaker for the Braswell PD and is itself an official policy of the City of Braswell.

102.   The Braswell PD's official policy, custom, pattern, and practice—established and effectuated by Defendant Jefferson as final policymaker, directly through his own acts, and through his ratification of his subordinates' acts—was the moving force behind, and the direct and proximate cause of, the violations of Martel's First Amendment rights described in this Complaint, including the retaliation against Martel for his protected political speech, candidacy, and criticism of Defendant Jefferson and the Braswell PD.

## COUNT ONE
## <u>VIOLATION OF FIRST AMENDMENT RIGHTS PURSUANT TO 42 U.S.C. § 1983</u>
**(Against Defendant Betsill in His Individual Capacity, Defendant Kenny in His Individual Capacity, Defendant Jefferson in His Individual Capacity, and Defendant City of Braswell)**

103.   Martel incorporates by reference paragraphs 1 through 102 of this Complaint as though set forth herein in their entirety.

104.   Martel has the clearly established First Amendment right to peaceably assemble at his private home along with the others who joined him for the Campaign Event to support Martel's candidacy for Mayor.

105.   Martel has the clearly established First Amendment right to run for political office.

106.   Martel has the clearly established First Amendment right to campaign for political office, including by advocating for himself to voters and associating with his political supporters.

107. Martel has the clearly established First Amendment right to express his critical viewpoint of Defendant Jefferson and Braswell PD.

108. Martel has the clearly established constitutional right to be free from retaliation by government actors for exercising his First Amendment rights.

109. Martel has the clearly established First Amendment right to be free from government action that targets, burdens, or punishes him on the basis of the viewpoint of his protected speech, association, or assembly.

110. At the Campaign Event, Martel was exercising these First Amendment rights along with the others assembled there, including voters and political supporters.

111. By September 1, 2025, Defendant Betsill, Defendant Kenny, Defendant Jefferson, and Defendant City of Braswell knew that Martel was running for mayor and that his campaigning included expressing his critical viewpoint of Defendant Jefferson and the Braswell PD.

112. By September 1, 2025, Defendant Betsill, Defendant Kenny, Defendant Jefferson, and Defendant City of Braswell knew of the Braswell PD's concerted action against Martel that had been undertaken pursuant to the Braswell PD's official policy, custom, pattern, and practice of attempting to prevent Martel from becoming mayor, including through the intentional interference with Martel's First

Amendment rights and the intentional damaging of his professional, political, and personal reputation.

113. Prior to the Braswell PD officers arriving at Martel's Campaign Event, Defendant Betsill, Defendant Kenny, Defendant Jefferson, and Defendant City of Braswell knew that Martel was holding a political event at his private home for his campaign to be mayor.

114. Indeed, Defendant Jefferson had told a Polk County election official that he would shut down the Campaign Event. The Polk County election official warned Defendant Jefferson against engaging in this unlawful act, but Defendant Jefferson was intent on violating Martel's First Amendment rights.

115. Acting under color of state law, Defendant Jefferson directed Defendant Betsill and Defendant Kenny to shut down the Campaign Event and issue citations to Martel.

116. Defendant Betsill, Defendant Kenny, Defendant Jefferson, and Defendant City of Braswell were clearly on notice that issuing citations to Martel and shutting down his Campaign Event without probable cause, with the purpose of depriving him of his First Amendment rights, and in retaliation for the exercise of Martel's First Amendment rights, would violate Martel's constitutional rights.

117. Acting under the color of state law, Defendant Betsill and Defendant Kenny, at the direction of Defendant Jefferson and the Braswell PD, intentionally

and maliciously violated Martel's First Amendment rights by shutting down his Campaign Event and issuing citations to him.

118. After shutting down the Campaign Event, Defendant Betsill and Defendant Kenny, at the direction of Defendant Jefferson and the Braswell PD, repeatedly returned to the cul-de-sac where Martel lived and held the Campaign Event in order to intimidate Martel, his supporters, and his potential voters, and to prevent them from rejoining their lawful assembly.

119. Independently of the retaliation alleged above, Defendant Betsill, Defendant Kenny, Defendant Jefferson, and the Braswell PD's conduct in shutting down the Campaign Event, issuing the two baseless citations, and returning to Martel's cul-de-sac to intimidate Martel and his supporters constituted viewpoint discrimination in violation of the First Amendment.

120. Defendant Jefferson, Defendant Betsill, Defendant Kenny, and the Braswell PD targeted Martel and the Campaign Event for adverse government action specifically because of the viewpoint of Martel's protected speech, candidacy, and assembly—namely, Martel's critical viewpoint regarding Defendant Jefferson, Mayor Fennell, and the operations of the Braswell PD.

121. Had the Campaign Event been a political gathering supportive of Defendant Jefferson, Mayor Fennell, and/or Braswell's existing leadership, Defendant Jefferson, Defendant Betsill, Defendant Kenny, and the Braswell PD

would not have shut it down, issued citations to Martel, or returned to intimidate its participants.

122. Defendant Jefferson, Defendant Betsill, Defendant Kenny, and the Braswell PD's selection of Martel's Campaign Event for adverse action—out of all the lawful political and family-friendly gatherings occurring in the City of Braswell—was driven by, and motivated by, the viewpoint Martel and his supporters were expressing.

123. Defendant Betsill, Defendant Kenny, Defendant Jefferson, and the Braswell PD did this with the malicious intent to harm Martel and in a conscious effort to retaliate against him for having exercised his First Amendment rights, including running for political office, campaigning, peaceably assembling, and criticizing Defendant Jefferson and the Braswell PD. In short, Defendant Betsill, Defendant Kenny, Defendant Jefferson, and Defendant City of Braswell's conduct was motivated by Martel's First Amendment protected activity, including his viewpoint.

124. Defendant Betsill, Defendant Kenny, Defendant Jefferson, and Defendant City of Braswell acted pursuant to the Braswell PD's official policy, custom, pattern, and practice of attempting to prevent Martel from becoming mayor, including through the intentional interference with Martel's First Amendment rights and the intentional damaging of his professional, political, and personal reputation.

34

125. Defendant Jefferson was acting within the course and scope of his position as the Chief of Police, was acting under color of state law, and was acting to establish and effectuate the official policy, custom, pattern, and practice of the Braswell PD.

126. Defendant Jefferson had final policymaking authority for the Braswell PD with respect to the supervision, direction, deployment, and operational decision-making of its officers, and he personally directed, authorized, and ratified the conduct of Defendant Betsill and Defendant Kenny described in this Count.

127. There was no probable cause or arguable probable cause to issue the two citations to Martel, whose conduct in holding the Campaign Event was entirely lawful.

128. Defendant Betsill, Defendant Kenny, Defendant Jefferson, and the Braswell PD knew that there was no probable cause or arguable probable cause to issue the two citations to Martel, whose conduct in holding the Campaign Event was entirely lawful, or to shut down the Campaign Event.

129. Defendant Betsill, Defendant Kenny, Defendant Jefferson, and the Braswell PD's above-described conduct, considered alone or in combination with the broader course of conduct described above, would likely deter a person of ordinary firmness from exercising his or her constitutional rights.

35

130. Defendant City of Braswell is liable for the violations of Martel's constitutional rights under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978), and its progeny, on each of the following independent grounds: (a) the violations were caused by decisions of Defendant Jefferson, the final policymaking authority for the Braswell PD, acting in his official capacity; (b) Defendant Jefferson, as final policymaker, ratified the decisions of his subordinates and the bases for those decisions; (c) the violations were caused by a custom, pattern, and practice of the Braswell PD so persistent and widespread as to constitute the de facto policy of the Braswell PD; and (d) the violations were caused by the Braswell PD's official policy, formally adopted and effectuated through the acts and directives of its final policymaker.

131. As the direct and proximate result of Defendant Betsill, Defendant Kenny, Defendant Jefferson, and Defendant City of Braswell's violation of Martel's constitutional rights, Martel has suffered damages in an amount to be proven at trial, including mental and emotional suffering, damages to his constitutional rights and his reputation, loss of liberty, and out of pocket costs.

132. Defendant Betsill, Defendant Kenny, and Defendant Jefferson's conduct was motivated by that kind of ill will, malice, and conscious indifference and reckless disregard for the consequences of their actions and for Martel's rights

36

that justifies an award to Martel of punitive damages against Defendant Betsill,

Defendant Kenny, and Defendant Jefferson.

133.   Martel is further entitled to an award of his reasonable attorney's fees

and expenses pursuant to 42 U.S.C. § 1988.

**COUNT TWO**
**<u>VIOLATION OF FIRST AMENDMENT RIGHTS PURSUANT TO 42</u>**
**<u>U.S.C. § 1983</u>**
**(Against Defendant Jefferson in His Individual Capacity, Defendant Simmons**
**in His Individual Capacity, and Defendant City of Braswell)**

134.   Martel incorporates by reference paragraphs 1 through 102 of this

Complaint as though set forth herein in their entirety.

135.   Martel has the clearly established First Amendment right to run for

political office.

136.   Martel has the clearly established First Amendment right to express his

critical viewpoint of Defendant Jefferson and Braswell PD.

137.   Martel has the clearly established constitutional right to be free from

retaliation by government actors for exercising his First Amendment rights.

138.   Martel has the clearly established First Amendment right to be free

from government action that targets, burdens, or punishes him on the basis of the

viewpoint of his protected speech.

139.   By May 6, 2025, Defendant Simmons, Defendant Jefferson, and

Defendant City of Braswell knew that Martel was running for mayor and that his

campaigning included expressing his critical viewpoint of Defendant Jefferson and the Braswell PD.

140. On May 9, 2025—just three days after the City Council Meeting announcement that Martel was running for mayor, acting under color of state law, Defendant Jefferson drafted a notice purporting to retroactively rescind his prior acceptance of Martel's voluntary resignation and reclassifying Martel's separation status as "terminated." This occurred approximately four months after Martel had in fact voluntarily resigned and was based on a stale alleged issue with police reports authored by one of Martel's direct reports—an issue that had been resolved in 2024 with no discipline against Martel.

141. On May 14, 2025, acting under color of state law, Defendant Jefferson and Defendant Simmons contacted a Georgia POST investigator and demanded that Martel's separation status be changed from voluntary resignation to termination based on a false premise.

142. Defendant Jefferson and Defendant City of Braswell manufactured this termination.

143. Georgia POST is the regulatory body responsible for certifying and disciplining peace officers in Georgia and has the authority to revoke an officer's certification—and thus end his law enforcement career—based on reported misconduct. Defendant Jefferson and Defendant Simmons knew that their false

38

report could result in or contribute to the revocation of Martel's POST certification and the end of his law enforcement career.

144. Defendant Jefferson, Defendant Simmons, and Defendant City of Braswell's communications to Georgia POST that Martel had been terminated was knowingly manufactured and done with the malicious intent to harm Martel and in a conscious effort to retaliate against him for having exercised his First Amendment rights, including running for political office and criticizing Defendant Jefferson and the Braswell PD. In short, Defendant Simmons, Defendant Jefferson, and the Braswell PD's conduct was motivated by Martel's First Amendment protected activity, including his viewpoint.

145. Defendant Simmons, Defendant Jefferson, and the Braswell PD's above-described conduct, considered alone or in combination with the broader course of conduct described above, would likely deter a person of ordinary firmness from exercising his or her constitutional rights.

146. Defendant Simmons, Defendant Jefferson, and the Braswell PD's accusations to Georgia POST triggered an investigation, which included Georgia POST notifying Martel of the accusations.

147. Before Martel could even respond to the accusations, Georgia POST abided by Defendant Simmons, Defendant Jefferson, and the Braswell PD's request

to change Martel's status from voluntary resignation to termination—which Martel was unable to undo despite his efforts.

148. Independently of the retaliation alleged above, Defendant Jefferson, Defendant Simmons, and the Braswell PD's conduct in retroactively reclassifying Martel's separation status as "terminated" based on a specious determination, and reporting that reclassification to Georgia POST, constituted viewpoint discrimination in violation of the First Amendment.

149. Defendant Jefferson, Defendant Simmons, and the Braswell PD targeted Martel for adverse government action specifically because of the viewpoint of Martel's protected speech and candidacy—namely, Martel's critical viewpoint regarding Defendant Jefferson and the Braswell PD and his publicly expressed intent, if elected, to bring accountability to the Braswell PD.

150. The timing of Defendant Jefferson, Defendant Simmons, and the Braswell PD's conduct confirms the viewpoint-based targeting: Defendant Jefferson drafted the false "termination" notice on May 9, 2025, just three days after Martel's candidacy for Mayor was publicly announced, and Defendant Jefferson, Defendant Simmons, and the Braswell PD contacted Georgia POST to falsely report the termination on May 14, 2025—notwithstanding that Martel had voluntarily resigned more than four months earlier.

40

151.    Had Martel expressed a viewpoint favorable to Defendant Jefferson and the Braswell PD, or had Martel not run for Mayor on a platform critical of Defendant Jefferson and the Braswell PD, Defendants would not have manufactured the purported termination or made the specious report to Georgia POST.

152.    Defendant Jefferson was acting within the course and scope of his position as the Chief of Police, was acting under color of state law, and was acting to establish and effectuate the official policy, custom, pattern, and practice of the Braswell PD.

153.    Defendant Jefferson and Defendant Simmons's communications to Georgia POST that Martel had been terminated were made pursuant to the Braswell PD official policy, pattern, practice, and custom, which from May 6, 2025, onward included the intentional interference with Martel's First Amendment rights, preventing him from becoming mayor, and damaging his professional, political, and personal standing and reputation.

154.    Defendant Jefferson had final decision making and policymaking authority for the Braswell PD with respect to the supervision, direction, internal investigations, external communications, and operational decision-making of its officers.

155.    Defendant City of Braswell is liable for the violations of Martel's constitutional rights under *Monell v. Department of Social Services of the City of*

41

*New York*, 436 U.S. 658 (1978), and its progeny, on each of the following independent grounds: (a) the violations were caused by decisions of Defendant Jefferson, the final policymaking authority for the Braswell PD, acting in his official capacity; (b) Defendant Jefferson, as final policymaker, ratified the decisions of his subordinates and the bases for those decisions; (c) the violations were caused by a custom, pattern, and practice of the Braswell PD so persistent and widespread as to constitute the de facto policy of the Braswell PD; and (d) the violations were caused by the Braswell PD's official policy, formally adopted and effectuated through the acts and directives of its final policymaker.

156. As the direct and proximate result of Defendant Simmons, Defendant Jefferson, and Defendant City of Braswell's violation of Martel's constitutional rights, Martel has suffered damages in an amount to be proven at trial, including mental and emotional suffering, damages to his constitutional rights and his reputation.

157. Defendant Simmons and Defendant Jefferson's conduct was motivated by that kind of ill will, malice, and conscious indifference and reckless disregard for the consequences of their actions and for Martel's rights that justifies an award to Martel of punitive damages against the individual defendants.

158. Martel is further entitled to an award of his reasonable attorney's fees and expenses pursuant to 42 U.S.C. § 1988.

**COUNT THREE**
**VIOLATION OF FIRST AMENDMENT RIGHTS PURSUANT TO 42**
**U.S.C. § 1983**
**(Against Defendant Jefferson in His Individual Capacity, Defendant Simmons**
**in His Individual Capacity, and Defendant City of Braswell)**

159.   Martel incorporates by reference paragraphs 1 through 102 of this Complaint as though set forth herein in their entirety.

160.   Martel has the clearly established First Amendment right to run for political office.

161.   Martel has the clearly established First Amendment right to express his critical viewpoint of Defendant Jefferson and Braswell PD.

162.   Martel has the clearly established constitutional right to be free from retaliation by government actors for exercising his First Amendment rights.

163.   Martel has the clearly established First Amendment right to be free from government action that targets, burdens, or punishes him on the basis of the viewpoint of his protected speech.

164.   By May 6, 2025, Defendant Simmons, Defendant Jefferson, and Defendant City of Braswell knew that Martel was running for mayor and that his campaigning included expressing his critical viewpoint of Defendant Jefferson and the Braswell PD.

165.   By June 16, 2025, Defendant Simmons, Defendant Jefferson, and Defendant City of Braswell knew of the Braswell PD's concerted action against

Martel that had been undertaken pursuant to the Braswell PD's official policy, custom, pattern, and practice of attempting to prevent Martel from becoming mayor, including through the intentional interference with Martel's First Amendment rights and the intentional damaging of his professional, political, and personal reputation.

166. On June 16, 2025, at the direction of Defendant Jefferson, who was acting under color of state law, the Braswell PD provided two letters from its officers to the Emerson PD accusing Martel of making disparaging statements about Defendant Jefferson at the scene of a Polk County vehicle accident and of interfering with the accident investigation.

167. Defendant Simmons, Defendant Jefferson, and Defendant City of Braswell were attempting to have Martel disciplined, if not terminated, by Martel's new employer—the Emerson PD.

168. The accusations in the letters were knowingly false. The Emerson PD conducted an independent investigation into the accusations—including by obtaining objective video footage from the Polk County Police Department after Defendant Simmons resisted producing it—and determined that the accusations were meritless and did not warrant any discipline.

169. Defendant Jefferson was acting within the course and scope of his position as the Chief of Police, was acting under color of state law, and was acting to establish and effectuate the official policy, custom, pattern, and practice of the

44

Braswell PD, which from May 6, 2025, onward included the intentional interference with Martel's First Amendment rights, preventing him from becoming mayor, and damaging his professional, political, and personal reputation and standing.

170. Defendant Jefferson had final decision-making and policymaking authority for the Braswell PD with respect to the supervision, direction, internal investigations, external communications, and operational decision-making of its officers.

171. One of the letters was written by Defendant Simmons, acting under color of state law, at the direction of Defendant Jefferson, and pursuant to the official policy, custom, pattern, and practice of the Braswell PD, which from May 6, 2025, onward included the intentional interference with Martel's First Amendment rights, preventing him from becoming mayor, and damaging his professional, political, and personal reputation and standing.

172. Independently of the retaliation alleged above, Defendant Jefferson, Defendant Simmons, and the Braswell PD's conduct in submitting the June 16, 2025, letters to the Emerson PD constituted viewpoint discrimination in violation of the First Amendment.

173. Defendant Jefferson, Defendant Simmons, and the Braswell PD targeted Martel for adverse government action specifically because of the viewpoint

of Martel's protected speech and candidacy—namely, Martel's critical viewpoint regarding Defendant Jefferson and the Braswell PD.

174. Defendant Jefferson, Defendant Simmons, and the Braswell PD's viewpoint-based targeting is confirmed by the substance of the letters themselves, which accused Martel of making "disparaging statements about Defendant Jefferson"—accusing Martel, in other words, of expressing the very viewpoint Defendants sought to punish.

175. Had Martel been viewed as supportive of, or neutral toward, Defendant Jefferson and the Braswell PD, Defendant Jefferson, Defendant Simmons, and the Braswell PD would not have submitted the June 16, 2025, letters to the Emerson PD or otherwise sought to have Martel disciplined by his new employer.

176. The Emerson PD conducted an independent investigation into the accusations and found they were meritless and did not warrant any discipline.

177. As Defendant Jefferson, Defendant Simmons, and the Braswell PD intended, the Emerson PD informed Martel of their accusations and questioned him as part of the investigation.

178. Defendant Jefferson, Defendant Simmons, and the Braswell PD's communications to the Emerson PD were knowingly false and done with the malicious intent to harm Martel and in a conscious effort to retaliate against him for having exercised his First Amendment rights, including running for political office

46

and criticizing Defendant Jefferson and the Braswell PD. In short, Defendant Simmons's, Defendant Jefferson, and the Braswell PD's conduct was motivated by Martel's First Amendment protected activity, including his viewpoint.

179. Defendant Simmons, Defendant Jefferson, and the Braswell PD's above-described conduct, considered alone or in combination with the broader course of conduct described above, would likely deter a person of ordinary firmness from exercising his or her constitutional rights.

180. Defendant City of Braswell is liable for the violations of Martel's constitutional rights under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978), and its progeny, on each of the following independent grounds: (a) the violations were caused by decisions of Defendant Jefferson, the final policymaking authority for the Braswell PD, acting in his official capacity; (b) Defendant Jefferson, as final policymaker, ratified the decisions of his subordinates and the bases for those decisions; (c) the violations were caused by a custom, pattern, and practice of the Braswell PD so persistent and widespread as to constitute the de facto policy of the Braswell PD; and (d) the violations were caused by the Braswell PD's official policy, formally adopted and effectuated through the acts and directives of its final policymaker.

181. As the direct and proximate result of Defendant Simmons, Defendant Jefferson, and Defendant City of Braswell's violation of Martel's constitutional

rights, Martel has suffered damages in an amount to be proven at trial, including mental and emotional suffering, damages to his constitutional rights and his reputation.

182. Defendant Simmons and Defendant Jefferson's conduct was motivated by that kind of ill will, malice, and conscious indifference and reckless disregard for the consequences of their actions and for Martel's rights that justifies an award to Martel of punitive damages against Defendant Simmons and Defendant Jefferson.

183. Martel is further entitled to an award of his reasonable attorney's fees and expenses pursuant to 42 U.S.C. § 1988.

**COUNT FOUR**
**VIOLATION OF FIRST AMENDMENT RIGHTS PURSUANT TO 42**
**U.S.C. § 1983**
**(Against Defendant Jefferson in His Individual Capacity, Defendant Kenny in His Individual Capacity, and Defendant City of Braswell)**

184. Martel incorporates by reference paragraphs 1 through 102 of this Complaint as though set forth herein in their entirety.

185. Martel has the clearly established First Amendment right to run for political office.

186. Martel has the clearly established First Amendment right to express his critical viewpoint of Defendant Jefferson and Braswell PD.

187. Martel has the clearly established constitutional right to be free from retaliation by government actors for exercising his First Amendment rights.

48

188. Martel has the clearly established First Amendment right to be free from government action that targets, burdens, or punishes him on the basis of the viewpoint of his protected speech.

189. By May 6, 2025, Defendant Jefferson, Defendant Kenny, and Defendant City of Braswell knew that Martel was running for mayor and that his campaigning included expressing his critical viewpoint of Defendant Jefferson and the Braswell PD.

190. After that time, Defendant Jefferson, Defendant Kenny, and Defendant City of Braswell attempted to have Martel disciplined, if not terminated, by Martel's new employer—the Emerson PD.

191. By October 8, 2025, Defendant Jefferson, Defendant Kenny, and Defendant City of Braswell knew of the Braswell PD's concerted action against Martel that had been undertaken pursuant to the Braswell PD's official policy, custom, pattern, and practice of attempting to prevent Martel from becoming mayor, including through the intentional interference with Martel's First Amendment rights and the intentional damaging of his professional, political, and personal reputation.

192. On October 8, 2025, at the direction of Defendant Jefferson, Defendant Kenny sent a Facebook message to the Mayor of the City of Emerson, Bo Jordan, falsely stating that Martel is "on the Ga Brady list" and that he was dismissed from the Braswell PD for "untruthfulness."

193.    A "Brady list" is a list maintained by prosecutors of law enforcement officers who have a documented history of dishonesty, bias, or other misconduct that could undermine their credibility as witnesses in court. When a law enforcement officer is placed on a Brady list, prosecutors will generally refuse to call that officer to testify, which means the officer cannot perform a fundamental function of the job and will generally be terminated and rendered un-hirable as a law enforcement officer.

194.    Defendant Kenny's October 8, 2025, Facebook message was false in multiple respects. There is no centralized Georgia Brady list, and Martel has never been on any Brady list maintained by any prosecutor in Georgia or elsewhere. Martel was not "dismissed" from the Braswell PD—he voluntarily resigned. And even after the Braswell PD falsely reclassified his separation status as "terminated" in May 2025, the purported basis for that reclassification was not "untruthfulness."

195.    Defendant Jefferson and Defendant Kenny knew that the accusations in the Facebook message were false at the time the message was sent. Defendant Jefferson knew Martel had voluntarily resigned because Defendant Jefferson had personally accepted that resignation. Defendant Kenny knew Martel was not on any Georgia Brady list, including because no such list existed and because Defendant Kenny fabricated the accusation from whole cloth.

50

196. Defendant Jefferson and Defendant Kenny knew that sending the false Brady-list accusation to the Mayor of Emerson would, if believed, likely result in Martel's termination from the Emerson PD and could render Martel un-hirable as a law enforcement officer anywhere in Georgia.

197. Defendant Kenny, Defendant Jefferson, and the Braswell PD's above-described conduct, considered alone or in combination with the broader course of conduct described above, would likely deter a person of ordinary firmness from exercising his or her constitutional rights.

198. Defendant Jefferson and Defendant Kenny knew and intended that accusations being levied in the Facebook message would prompt action by the Emerson PD, including Martel being informed of the accusations and asked about them—which he was.

199. Independently of the retaliation alleged above, Defendant Jefferson, Defendant Kenny, and the Braswell PD's conduct in sending the October 8, 2025, Facebook message to Emerson Mayor Bo Jordan constituted viewpoint discrimination in violation of the First Amendment.

200. Defendant Jefferson, Defendant Kenny, and the Braswell PD targeted Martel for adverse government action specifically because of the viewpoint of Martel's protected speech and candidacy—namely, Martel's critical viewpoint regarding Defendant Jefferson and the Braswell PD.

51

201.  The October 8, 2025, message was sent during the final weeks of Martel's mayoral campaign, when Martel was most actively expressing his critical viewpoint to the voters of Braswell.

202.  Had Martel expressed a viewpoint favorable to Defendant Jefferson and the Braswell PD, or had Martel not been a candidate for Mayor running on a platform critical of Defendant Jefferson and the Braswell PD, Defendant Jefferson, Defendant Kenny, and the Braswell PD would not have fabricated the false Brady-list and "untruthfulness" accusations against Martel or transmitted them to the Mayor of the City of Emerson.

203.  Defendant Jefferson was acting within the course and scope of his position with as the Chief of Police and was acting to establish and effectuate the official policy, custom, pattern, and practice of the Braswell PD, which from May 6, 2025, onward included the intentional interference with Martel's First Amendment rights, preventing him from becoming mayor, and damaging his professional, political, and personal standing and reputation.

204.  Defendant Jefferson had final decision-making and policymaking authority for the Braswell PD with respect to the supervision, direction, internal investigations, external communications, and operational decision-making of its officers.

205. Defendant Kenny was acting under color of state law, within the course and scope of his employment with the Braswell PD, and pursuant to the official policy, custom, pattern, and practice of the Braswell PD, which from May 6, 2025, onward included the intentional interference with Martel's First Amendment rights, preventing him from becoming mayor, and damaging his professional, political, and personal standing and reputation.

206. Defendant Jefferson, Defendant Kenny, and the Braswell PD's communications to the Mayor of the City of Emerson were knowingly false and done with the malicious intent to harm Martel and in a conscious effort to retaliate against him for having exercised his First Amendment rights, including running for political office and criticizing Defendant Jefferson and the Braswell PD. In short, Defendant Kenny, Defendant Jefferson, and the Braswell PD's conduct was motivated by Martel's First Amendment protected activity, including his viewpoint.

207. Defendant City of Braswell is liable for the violations of Martel's constitutional rights under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978), and its progeny, on each of the following independent grounds: (a) the violations were caused by decisions of Defendant Jefferson, the final policymaking authority for the Braswell PD, acting in his official capacity; (b) Defendant Jefferson, as final policymaker, ratified the decisions of his subordinates and the bases for those decisions; (c) the violations were caused by a

53

custom, pattern, and practice of the Braswell PD so persistent and widespread as to constitute the de facto policy of the Braswell PD; and (d) the violations were caused by the Braswell PD's official policy, formally adopted and effectuated through the acts and directives of its final policymaker.

208.   As the direct and proximate result of Defendant Kenny, Defendant Jefferson, and Defendant City of Braswell's violation of Martel's constitutional rights, Martel has suffered damages in an amount to be proven at trial, including mental and emotional suffering, damages to his constitutional rights and his reputation.

209.   Defendant Kenny and Defendant Jefferson's conduct was motivated by that kind of ill will, malice, and conscious indifference and reckless disregard for the consequences of their actions and for Martel's rights that justifies an award to Martel of punitive damages against the Defendant Kenny and Defendant Jefferson.

210.   Martel is further entitled to an award of his reasonable attorney's fees and expenses pursuant to 42 U.S.C. § 1988.

## COUNT FIVE
## VIOLATION OF FIRST AMENDMENT RIGHTS PURSUANT TO 42 U.S.C. § 1983
**(Against Defendant Jefferson in His Individual Capacity, and Defendant City of Braswell)**

211.   Martel incorporates by reference paragraphs 1 through 102 of this Complaint as though set forth herein in their entirety.

54

212. Martel has the clearly established First Amendment right to run for political office, to engage in political speech, to associate with his political supporters, and to publicly criticize public officials, including Defendant Jefferson and the Braswell PD.

213. Martel has the clearly established First Amendment right to be free from government action that targets, burdens, or punishes him on the basis of the viewpoint of his protected speech.

214. Martel has the clearly established constitutional right to be free from retaliation by government actors for exercising his First Amendment rights.

215. By May 6, 2025, Defendant Jefferson and Defendant City of Braswell knew that Martel was running for Mayor of Braswell and that Martel's campaign included publicly expressing his critical viewpoint of Defendant Jefferson and the Braswell PD.

216. On November 7, 2025—three days after Martel lost the mayoral election—Defendant Jefferson, acting under color of state law and using his official Braswell Police Department email account and identifying himself by his official title as "Chief Jefferson of the Braswell Police Department," sent an email to Kyle Teems, Chief of the Emerson Police Department, regarding Martel.

217. The November 7, 2025, email contained the following statements and assertions, among others:

55

a. That Martel "obviously [had] taken [losing the election] extremely hard and is definitely upset that I terminated him";

b. That Martel "ran for mayor in hopes of winning so that he could do what he thought he could do, and that was to terminate me";

c. That Martel was "intimidating" the Braswell City Clerk through "negativity and outrageous actions he's posting online against the city and it's [sic] officials";

d. That Martel had "drove his city issued patrol vehicle to city hall on his personal time . . . during the night and took video footage of himself measuring distances from city hall to across the street";

e. That Martel had been "speeding back and forth following [Defendant Jefferson's internal affairs sergeant] in his city issued vehicle and yelling out the window at her as she distributed literature to the residents"; and

f. That Defendant Jefferson was "very concerned about my admin staff feeling safe and not feeling intimidated by [Martel's] actions" and sought "assistance . . . in resolving this issue with Remi Martel and his negativity against the city of Braswell."

218. The above statements and assertions were knowingly false or, at a minimum, made with reckless disregard for the truth. Specifically:

56

a. Defendant Jefferson did not in fact terminate Martel from the Braswell PD when Martel left the department. Martel voluntarily resigned on January 28, 2025, and Defendant Jefferson personally accepted that voluntary resignation at that time. The purported "termination" was a retroactive reclassification fabricated by Defendant Jefferson on May 9, 2025—more than four months after Martel had voluntarily resigned and three days after Martel's mayoral candidacy was publicly announced;

b. Martel did not intimidate the Braswell City Clerk or any other Braswell City official, including through social media posts.

c. Martel did not speed back and forth following a Braswell PD Internal Affairs Sergeant in any vehicle, yell out the window at her, or otherwise engage in the conduct attributed to him.

219. Defendant Jefferson knew each of the foregoing statements was false at the time he sent the November 7, 2025, email.

220. Defendant Jefferson sent the November 7, 2025 email in retaliation for, and motivated by, Martel's exercise of his First Amendment rights, including: (a) Martel's candidacy for Mayor of Braswell; (b) Martel's public political speech and criticism of Defendant Jefferson, Mayor Fennell, and the Braswell PD; (c) Martel's public statements indicating that, if elected, Martel intended to bring accountability

to the Braswell PD; and (d) Martel's association with his political supporters and voters.

221. Defendant Jefferson's retaliatory motive is established on the face of the November 7, 2025, email itself, in which Defendant Jefferson expressly references Martel's "negativity against the city of Braswell," Martel's "negativity and outrageous actions he's posting online against the city and it's [sic] officials," and Martel's purported motive in running for Mayor as having been "to terminate me."

222. But for Martel's exercise of his First Amendment rights—including his candidacy, his political speech, and his criticism of Defendant Jefferson and the Braswell PD—Defendant Jefferson would not have sent the November 7, 2025, email to the Chief of the Emerson PD.

223. Independently, Defendant Jefferson's November 7, 2025, email constitutes viewpoint discrimination in violation of the First Amendment. Defendant Jefferson targeted Martel for adverse government action specifically because of the viewpoint of Martel's protected speech—namely, Martel's critical viewpoint regarding Defendant Jefferson, Mayor Fennell, and the operations of the Braswell PD.

224. The email itself identifies the viewpoint Defendant Jefferson sought to punish, characterizing Martel's protected speech as "negativity against the city of

Braswell" and "negativity and outrageous actions . . . against the city and it's [sic] officials."

225. Upon information and belief, had Martel expressed a favorable or supportive viewpoint regarding Defendant Jefferson, Mayor Fennell, or the Braswell PD, Defendant Jefferson would not have sent the November 7, 2025, email or any analogous communication to Martel's employer.

226. The November 7, 2025, email was sent for the purpose, and with the foreseeable and intended effect, of: (a) damaging Martel's professional standing and reputation with his current employer; (b) causing Martel to be disciplined, investigated, or terminated by the Emerson PD; (c) damaging Martel's personal, political, and professional reputation; and (d) punishing Martel for his exercise of his First Amendment rights and deterring him from continuing to engage in protected speech regarding Defendant Jefferson and the Braswell PD.

227. Defendant Jefferson knew, and intended, that the Chief of the Emerson PD would, upon receipt of the November 7, 2025 email, take action in response to the accusations therein. As Defendant Jefferson knew and intended, the Emerson PD did in fact take action in response to the email, including by communicating to Martel that Defendant Jefferson was making these accusations and asking him about said accusations.

228.   Defendant Jefferson was acting within the course and scope of his position as the Chief of Police, was acting under color of state law, and was acting to establish and effectuate the official policy, custom, pattern, and practice of the Braswell PD, which from May 6, 2025, onward included the intentional interference with Martel's First Amendment rights, preventing him from becoming Mayor, retaliating against him for the exercise of those rights, and damaging his professional, political, and personal standing and reputation.

229.   Defendant Jefferson had final policymaking authority for the Braswell PD with respect to the supervision, direction, internal investigations, external communications, and operational decision-making of its officers, including with respect to communications with other law enforcement agencies about current or former Braswell PD officers.

230.   Defendant Jefferson's November 7, 2025, email was an act of the final policymaker for the Braswell PD and itself constitutes the official policy of the City of Braswell.

231.   Defendant Jefferson's conduct, considered alone or in combination with the broader course of conduct described above, would likely deter a person of ordinary firmness from exercising his or her First Amendment rights, including from running for political office, engaging in political speech, peaceably assembling,

associating with political supporters, or publicly criticizing public officials and law enforcement agencies.

232. Defendant City of Braswell is liable for the violations of Martel's constitutional rights under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978), and its progeny, on each of the following independent grounds: (a) the violations were caused by decisions of Defendant Jefferson, the final policymaking authority for the Braswell PD, acting in his official capacity; (b) the violations were caused by a custom, pattern, and practice of the Braswell PD so persistent and widespread as to constitute the de facto policy of the Braswell PD; and (c) the violations were caused by the Braswell PD's official policy, formally adopted and effectuated through the acts and directives of its final policymaker.

233. As the direct and proximate result of Defendant Jefferson's and Defendant City of Braswell's violation of Martel's constitutional rights, Martel has suffered damages in an amount to be proven at trial, including mental and emotional suffering, damages to his constitutional rights, and damages to his professional, political, and personal reputation and standing.

234. Defendant Jefferson's conduct was motivated by that kind of ill will, malice, and conscious indifference and reckless disregard for the consequences of

his actions and for Martel's rights that justifies an award to Martel of punitive damages against Defendant Jefferson.

235.   Martel is further entitled to an award of his reasonable attorney's fees and expenses pursuant to 42 U.S.C. § 1988.

**COUNT SIX**
**VIOLATION OF FIRST AMENDMENT RIGHTS PURSUANT TO 42 U.S.C. § 1983**
**(Against Defendant Jefferson in His Individual Capacity and Defendant City of Braswell)**

236.   Martel incorporates by reference paragraphs 1 through 102 of this Complaint as though set forth herein in their entirety.

237.   This Count is pleaded in the alternative to Counts One through Five.

238.   Martel has the clearly established First Amendment right to run for political office.

239.   Martel has the clearly established First Amendment right to engage in political speech, including the right to publicly criticize public officials and government agencies such as Defendant Jefferson, Mayor Fennell, and the Braswell PD.

240.   Martel has the clearly established First Amendment right to peaceably assemble at his private home with his political supporters, voters, and other members of the public.

241.   Martel has the clearly established First Amendment right to associate with his political supporters, voters, and campaign team in support of his candidacy for Mayor of Braswell.

242.   Martel has the clearly established constitutional right to be free from retaliation by government actors for exercising his First Amendment rights.

243.   Martel has the clearly established constitutional right to be free from government action that targets, burdens, or punishes him on the basis of the viewpoint of his protected speech, association, or assembly.

244.   By May 6, 2025, Defendant Jefferson and Defendant City of Braswell knew that Martel was running for Mayor of Braswell, that his campaign included publicly expressing his critical viewpoint of Defendant Jefferson, Mayor Fennell, and the Braswell PD, and that Martel had publicly indicated that, if elected, he intended to bring accountability to the Braswell PD.

245.   Defendant Jefferson has admitted that he understood that if Martel were elected Mayor, Martel would "terminate" him from his position as Chief of the Braswell PD.

246.   From at least May 6, 2025, forward, Defendant Jefferson, acting under color of state law and as the final policymaker for the Braswell PD, established, directed, authorized, ratified, and effectuated a coordinated, sustained, multi-month course of conduct against Martel. The course of conduct included, but was not

limited to, the conduct described in paragraphs above in the background section, and is summarized for purposes of this Count as follows:

    a. On May 9, 2025, three days after the public announcement of Martel's candidacy, Defendant Jefferson manufactured and disseminated a false "termination" notice retroactively reclassifying Martel's voluntary resignation as a termination;

    b. On May 14, 2025, Defendant Jefferson and Defendant Simmons made false reports to Georgia POST in an effort to revoke or impair Martel's law enforcement certification and end his law enforcement career;

    c. In and around May 2025, Defendant Jefferson and Defendant Simmons made false and disparaging statements to the Emerson PD's background investigator in an effort to prevent Martel's hiring as a law enforcement officer at the Emerson PD;

    d. On June 16, 2025, Defendant Jefferson directed and authorized the transmission of two letters to the Emerson PD containing false accusations against Martel in an effort to have Martel disciplined or terminated by his new employer;

    e. On September 1, 2025, Defendant Jefferson personally directed the shutdown of Martel's lawful Campaign Event at his private home and the issuance of two baseless criminal citations against Martel under a

non-existent Braswell ordinance and an inapplicable Braswell ordinance;

f. After the Campaign Event was shut down, Defendant Jefferson directed Braswell PD officers to repeatedly drive down Martel's cul-de-sac to intimidate Martel and his political supporters and prevent the Campaign Event from resuming;

g. On October 8, 2025, Defendant Jefferson directed and authorized Defendant Kenny to send a Facebook message to Emerson Mayor Bo Jordan containing the false accusation that Martel was on a "GA Brady list" and the false accusation that Martel had been dismissed from the Braswell PD for "untruthfulness"—accusations calculated to render Martel unable to execute his fundamental duties as a law enforcement officer;

h. On November 4, 2025 (election day), Defendant Jefferson directed Braswell PD officers to drive a marked Braswell PD cruiser around Martel's cul-de-sac at least nine times despite the absence of any criminal activity, in a direct effort to intimidate Martel on the day of the election;

i. On at least three additional occasions during this period, Defendant Jefferson directed Braswell PD officers to drive a marked Braswell PD

cruiser around Martel's cul-de-sac to stare him down, despite the absence of any criminal activity;

j.  On November 7, 2025, three days after the mayoral election, Defendant Jefferson personally sent an email to the Chief of the Emerson PD containing multiple false accusations against Martel, including the false accusation that Defendant Jefferson had terminated Martel's employment (despite Martel resigning voluntarily), the false accusation that Martel had intimidated the Braswell City Clerk and other City officials, and the false accusation that Martel had been speeding back and forth following a Braswell PD internal affairs sergeant; and

k.  Throughout the mayoral campaign, Martel's campaign signs in the City of Braswell were systematically destroyed; upon information and belief, this destruction was done by or at the direction of Defendant Jefferson and Braswell PD officers in furtherance of the course of conduct described above.

247.  The course of conduct described above was not random, episodic, or attributable to the independent judgment of individual officers. It was a sustained, multi-month campaign carried out by multiple Braswell PD officers across multiple ranks, each acting in coordination with and at the direction of Defendant Jefferson, who is the final policymaker for the Braswell PD.

248. The course of conduct described above was undertaken in retaliation for, and motivated by, Martel's exercise of his First Amendment rights, including: (a) Martel's candidacy for Mayor of Braswell; (b) Martel's public political speech and criticism of Defendant Jefferson, Mayor Fennell, and the Braswell PD; (c) Martel's public statements indicating that, if elected, he intended to bring accountability to the Braswell PD; (d) Martel's peaceable assembly with his political supporters; and (e) Martel's association with his political supporters and voters in support of his candidacy.

249. But for Martel's exercise of his First Amendment rights, Defendant Jefferson and Defendant City of Braswell would not have engaged in the course of conduct described above.

250. The course of conduct described above, considered as a single, integrated course of conduct, would plainly deter a person of ordinary firmness from exercising his or her First Amendment rights, including from running for political office, engaging in political speech, peaceably assembling, associating with political supporters, or publicly criticizing public officials and law enforcement agencies.

251. The cumulative effect of (a) false reports to Georgia POST threatening Martel's law enforcement certification and career; (b) repeated false communications to Martel's current and prospective employers calculated to have him disciplined or terminated; (c) false public statements to the Mayor and Chief of

Police of Emerson accusing Martel of being on a "Brady list" and of having been terminated for untruthfulness; (d) the shutdown of Martel's Campaign Event and the issuance of baseless criminal citations; (e) repeated surveillance and intimidation at Martel's home, including on election day; (f) the November 7, 2025 email to the Chief of the Emerson PD; and (g) the additional acts of intimidation, defamation, and retaliation described above, would plainly deter a person of ordinary firmness from exercising his or her First Amendment rights.

252. Even if any individual act described above, standing alone, might not satisfy the ordinary firmness standard, the integrated course of conduct plainly does.

253. Independently of the retaliation theory pled above, the course of conduct described above constituted viewpoint discrimination in violation of the First Amendment. Defendant Jefferson and Defendant City of Braswell targeted Martel for adverse government action specifically because of the viewpoint of Martel's protected speech, candidacy, association, and assembly—i.e., Martel's critical viewpoint regarding Defendant Jefferson, Mayor Fennell, and the operations of the Braswell PD.

254. The viewpoint-based nature of Defendant Jefferson and Defendant City of Braswell's targeting is established by, among other things: (a) Defendant Jefferson's express admission that he understood Martel's candidacy to be aimed at terminating him from his position as Chief of the Braswell PD; (b) the November 7,

68

2025 email in which Defendant Jefferson expressly characterizes Martel's protected speech as "negativity against the city of Braswell" and "negativity and outrageous actions . . . against the city and it's [sic] officials"; (c) the temporal correlation between Defendants' adverse actions and Martel's exercise of his critical viewpoint, including the May 9, 2025, manufactured termination notice issued three days after Martel's candidacy announcement; (d) Defendant Jefferson and Defendant City of Braswell's baseless enforcement of Braswell Ordinances 3-58 and 3-60 against Martel's politically critical gathering  (e) the substance of the June 16, 2025, letters to the Emerson PD, which accused Martel of making "disparaging statements" about Defendant Jefferson—accusing Martel, in other words, of expressing the very viewpoint Defendant Jefferson and Defendant City of Braswell sought to punish; and (f) the persistent, multi-month nature of the campaign, which began upon Martel's public expression of his critical viewpoint and continued through and beyond the election.

255.   Had Martel expressed a viewpoint favorable to Defendant Jefferson, Mayor Fennell, or the existing leadership of the City of Braswell, or had Martel not run for Mayor on a platform critical of Defendant Jefferson and the Braswell PD, Defendant Jefferson and Defendant City of Braswell would not have engaged in the course of conduct described above.

256.   Defendant Jefferson and Defendant City of Braswell selected Martel—out of all the citizens, public servants, and political candidates in the City of Braswell during the relevant period—as the target of a coordinated, multi-month campaign of adverse government action, which was driven by, and motivated by, the viewpoint Martel was expressing.

257.   Defendant Jefferson was at all relevant times acting within the course and scope of his position as the Chief of Police, was acting under color of state law, and was acting to establish and effectuate the official policy, custom, pattern, and practice of the Braswell PD.

258.   Defendant Jefferson had final policymaking authority for the Braswell PD with respect to the supervision, direction, deployment, discipline, internal investigations, external communications, and operational decision-making of its officers.

259.   Defendant Jefferson personally participated in, directed, authorized, approved, and ratified each material component of the course of conduct described above. Each of Defendant Jefferson's personal acts described herein—including the May 9, 2025, false termination notice, the May 14, 2025, false report to Georgia POST, the May 2025 communications with the Emerson PD background investigator, the June 16, 2025, letters, the September 1, 2025, directive to shut down the Campaign Event, the October 8, 2025 Facebook message, the cul-de-sac

surveillance, and the November 7, 2025, email—was an act at the direction of the final policymaker for the Braswell PD and itself constitutes the official policy of the City of Braswell.

260. Independently of Defendant Jefferson's direct participation, Defendant Jefferson ratified each act of his subordinates that comprised the course of conduct described above. Defendant Jefferson had the opportunity to review each of his subordinates' decisions and the bases for those decisions, and Defendant Jefferson approved of both the decisions and the bases for them. Defendant Jefferson's ratification of the conduct of his subordinates is not premised on a single isolated incident or a single failure to investigate, but on a persistent, multi-month course of conduct conducted openly and repeatedly within a small police department headed by Defendant Jefferson.

261. The course of conduct described above was the moving force behind, and the direct and proximate cause of, the violations of Martel's First Amendment rights described in this Count.

262. Defendant City of Braswell is liable for the violations of Martel's constitutional rights under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978), and its progeny, on each of the following independent grounds: (a) the violations were caused by decisions of Defendant Jefferson, the final policymaking authority for the Braswell PD, acting in his official

capacity; (b) Defendant Jefferson, as final policymaker, ratified the decisions of his subordinates and the bases for those decisions; (c) the violations were caused by a custom, pattern, and practice of the Braswell PD so persistent and widespread as to constitute the official policy of the Braswell PD; and (d) the violations were caused by the Braswell PD's official policy, formally adopted and effectuated through the acts and directives of its final policymaker.

263. As the direct and proximate result of Defendant Jefferson's and Defendant City of Braswell's violation of Martel's constitutional rights through the course of conduct described above, Martel has suffered damages in an amount to be proven at trial, including mental and emotional suffering, damages to his constitutional rights, damages to his professional, political, and personal reputation and standing, loss of liberty, and out-of-pocket costs.

264. Defendant Jefferson's conduct was motivated by that kind of ill will, malice, and conscious indifference and reckless disregard for the consequences of his actions and for Martel's rights that justifies an award to Martel of punitive damages against Defendant Jefferson.

265. Martel is further entitled to an award of his reasonable attorney's fees and expenses pursuant to 42 U.S.C. § 1988.

## COUNT SEVEN
## UNLAWFUL SEIZURE PURSUANT TO 42 U.S.C. § 1983 AND THE FOURTH AMENDMENT

**(Against Defendant Betsill in His Individual Capacity, Defendant Kenny in His Individual Capacity, Defendant Jefferson in His Individual Capacity, and Defendant City of Braswell)**

266. Martel incorporates by reference paragraphs 1 through 102 of this Complaint as though set forth herein in their entirety.

267. Martel has the clearly established Fourth Amendment right to be free from unreasonable seizure, including the right to be free from investigative detention in the absence of reasonable suspicion that he has committed, is committing, or is about to commit a criminal offense, and the right to be free from arrest or the issuance of criminal citations in the absence of probable cause.

268. On September 1, 2025, Martel was lawfully present at his own private home, hosting the Campaign Event for his candidacy for Mayor of Braswell.

269. Martel and his guests were engaged in lawful, family-friendly political activity, as described above.

270. On September 1, 2025, acting under color of state law and at the direction of Defendant Jefferson, Defendant Betsill and Defendant Kenny entered the curtilage of Martel's private home without a warrant, without consent, and without exigent circumstances.

271. Once on Martel's property, Defendant Betsill and Defendant Kenny, acting under color of state law and at the direction of Defendant Jefferson,

approached Martel, demanded that Martel produce his identification, and took possession of Martel's identification.

272. By approaching Martel on his own property, demanding and taking possession of his identification, ordering the Campaign Event shut down, and issuing two citations to Martel, Defendant Betsill and Defendant Kenny effected a Fourth Amendment seizure of Martel.

273. A reasonable person in Martel's position would not have felt free to terminate the encounter, decline the officers' demands, or leave. Among other things: (a) the officers were uniformed, armed Braswell PD officers acting in their official capacities; (b) the officers had taken physical possession of Martel's identification, which a reasonable person understands he cannot retrieve and walk away from without the officers' permission; (c) the officers had asserted their authority to shut down a political gathering that Martel was hosting on his own property; (d) the officers had issued, or were in the process of issuing, criminal citations to Martel; and (e) the officers' presence and conduct, in front of Martel's political supporters and family at his own home, communicated unmistakable governmental authority and command.

274. Martel did not feel free to leave, did not feel free to terminate the encounter, and did not feel free to decline Defendant Betsill and Defendant Kenny's demands. Martel submitted to the officers' show of authority by remaining present,

providing his identification, complying with the order to shut down the Campaign Event, and accepting the citations.

275. Accordingly, Martel was seized within the meaning of the Fourth Amendment.

276. The seizure of Martel began at the moment Defendant Betsill and Defendant Kenny demanded and took possession of his identification and continued through the issuance of the citations and the officers' departure from the property.

277. At the time of the seizure, Defendant Jefferson, Defendant Betsill, and Defendant Kenny had no reasonable suspicion, and no arguable reasonable suspicion, to believe that Martel or any of his guests had committed, were committing, or were about to commit any criminal offense.

278. At the time of the seizure, Defendant Jefferson, Defendant Betsill, and Defendant Kenny had no probable cause, and no arguable probable cause, to believe that Martel had committed, was committing, or was about to commit any criminal offense, including any violation of Braswell Ordinance 3-58 or Braswell Ordinance 3-60.

279. No reasonable officer in the position of Defendant Jefferson, Defendant Betsill, and Defendant Kenny could have believed that there was reasonable suspicion, arguable reasonable suspicion, probable cause, or arguable probable cause

to seize Martel or to issue him citations under Braswell Ordinance 3-58 or Braswell Ordinance 3-60. Specifically:

280. Braswell Ordinance 3-58 was not an active or enforceable ordinance. It was, on its face, described in the City of Braswell's published ordinances as "PENDING," and contained no operative language describing any prohibited conduct or any criminal offense. A reasonable officer cannot have probable cause, or arguable probable cause, to believe that any person has violated a non-existent ordinance.

281. Braswell Ordinance 3-60 prohibits "[a] disturbance of the public peace by three or more persons who meet together with an intent mutually to assist each other in the execution of some unlawful enterprise of a private nature, with force and violence." None of the elements of Ordinance 3-60 was present at the Campaign Event: there was no disturbance of the public peace; there was no unlawful enterprise of a private nature being executed; there was no intent to mutually assist in the execution of any unlawful enterprise; and there was no force or violence. The Campaign Event was, on its face, a lawful political gathering that bore no resemblance to the conduct prohibited by the ordinance.

282. Beyond the cited ordinances, there was no other state, federal, or municipal law that Martel could have been reasonably believed to have violated. The Campaign Event was a lawful, non-commercial, family-friendly political gathering

at Martel's private home, involving no alcohol, no loud noise, no commercial activity, no construction or manufacturing, no fighting, no unlawful enterprise, no force, and no violence.

283. Defendant Jefferson, Defendant Betsill, and Defendant Kenny knew at the time of the seizure that they lacked reasonable suspicion, arguable reasonable suspicion, probable cause, and arguable probable cause to seize Martel or to issue him citations. The illegitimacy of the seizure is confirmed by, among other things, the prompt dismissal of both citations within ten days of issuance—without Martel ever having to appear in court—and by Defendant Jefferson's advance statement to a Polk County election official that he intended to shut down the Campaign Event, which the election official warned him would be unlawful.

284. Defendant Jefferson, Defendant Betsill, and Defendant Kenny were acting pursuant to the official policy, custom, pattern, and practice of the Braswell PD, which from May 6, 2025 onward included the intentional interference with Martel's First Amendment rights, preventing him from becoming Mayor, retaliating against him for the exercise of those rights, and damaging his professional, political, and personal standing and reputation.

285. Defendant Jefferson knew at the time he directed the seizure that there was no reasonable suspicion, arguable reasonable suspicion, probable cause, or arguable probable cause to seize Martel or to issue him citations. Defendant

Jefferson directed the seizure not for any legitimate law enforcement purpose, but for the unlawful purposes described elsewhere in this Complaint—including to violate Martel's First Amendment rights and to retaliate against him for his protected speech, candidacy, and association.

286. At the time of the seizure, Martel's Fourth Amendment right to be free from seizure absent reasonable suspicion or probable cause was clearly established under controlling Supreme Court and Eleventh Circuit precedent. Any objectively reasonable officer in the position of Defendant Betsill, Defendant Kenny, or Defendant Jefferson would have known that the conduct described above violated the Fourth Amendment.

287. Defendant City of Braswell is liable for the violations of Martel's constitutional rights under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978), and its progeny, on each of the following independent grounds: (a) the violations were caused by decisions of Defendant Jefferson, the final policymaking authority for the Braswell PD, acting in his official capacity; (b) Defendant Jefferson, as final policymaker, ratified the decisions of his subordinates and the bases for those decisions; (c) the violations were caused by a custom, pattern, and practice of the Braswell PD so persistent and widespread as to constitute the de facto policy of the Braswell PD; and (d) the violations were caused

by the Braswell PD's official policy, formally adopted and effectuated through the acts and directives of its final policymaker.

288.   As the direct and proximate result of Defendant Betsill, Defendant Kenny, Defendant Jefferson, and Defendant City of Braswell's violation of Martel's Fourth Amendment rights, Martel has suffered damages in an amount to be proven at trial, including mental and emotional suffering, damages to his constitutional rights and his reputation, loss of liberty, and out-of-pocket costs.

289.   Defendant Betsill's, Defendant Kenny's, and Defendant Jefferson's conduct was motivated by that kind of ill will, malice, and conscious indifference and reckless disregard for the consequences of their actions and for Martel's rights that justifies an award to Martel of punitive damages against Defendant Betsill, Defendant Kenny, Defendant Jefferson.

290.   Martel is further entitled to an award of his reasonable attorney's fees and expenses pursuant to 42 U.S.C. § 1988.

## COUNT EIGHT
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (Against Defendant Jefferson in His Individual Capacity)

291.   Martel incorporates by reference paragraphs 1 through 102 of this Complaint as though set forth herein in their entirety.

292.   Separate and apart from Defendant Jefferson's intentional infliction of emotional distress upon Martel based on having the Campaign Event shut down and

Martel cited, Defendant Jefferson engaged in a coordinated, sustained, multi-month course of extreme and outrageous conduct against Martel, all for the purpose of violating and interfering with Martel's First Amendment rights, including the following:

a. On May 9, 2025—three days after Martel's mayoral candidacy was publicly announced—personally drafting a false notice purporting to retroactively rescind Martel's January 2025 voluntary resignation and falsely reclassify his separation status from the Braswell PD as a "termination," more than four months after Martel had voluntarily resigned;

b. On May 14, 2025, contacting a Georgia POST investigator and reporting that Martel had been terminated from the Braswell PD, knowing that this manufactured termination could result in the revocation of Martel's POST certification and the end of Martel's law enforcement career;

c. In and around May 2025, making knowingly false and disparaging statements about Martel to the Emerson PD's background investigator in an effort to prevent Martel from being hired as a law enforcement officer by the Emerson PD, including the knowingly false statement

that Martel was attempting to gather signatures on a petition to have Defendant Jefferson and Mayor Fennell removed from office;

d. On June 16, 2025, directing and authorizing the transmission of two letters to the Emerson PD containing knowingly false accusations that Martel had disparaged Defendant Jefferson and interfered with a Polk County vehicle accident investigation, in an effort to have Martel disciplined or terminated by his new employer;

e. On September 1, 2025, Defendant Jefferson directed Defendant Kenny and Defendant Betsill to shut down Martel's Campaign Event and issue citations to him—despite no arguable basis for doing—in an effort to prevent Martel from becoming Mayor of Braswell and to retaliate against him;

f. On October 8, 2025, directing and authorizing Defendant Kenny to send a Facebook message to Emerson Mayor Bo Jordan falsely stating that Martel was on a "GA Brady list" and that Martel had been dismissed from the Braswell PD for "untruthfulness"—accusations fabricated from whole cloth and calculated to render Martel unable to perform his fundamental duties as a law enforcement officer;

g. Directing Braswell PD officers to repeatedly drive marked Braswell PD cruisers down Martel's residential cul-de-sac to surveil and intimidate

81

Martel, including at least nine drive-bys on election day (November 4, 2025) and at least three additional occasions during the campaign period, despite the absence of any criminal activity in the cul-de-sac;

h. On November 7, 2025—three days after Martel lost the mayoral election—personally sending an email from his official Braswell PD email account to the Chief of the Emerson Police Department containing multiple knowingly false accusations against Martel, including the false accusation that Defendant Jefferson had terminated Martel's employment (rather than Martel leaving voluntarily), the false accusation that Martel had intimidated the Braswell City Clerk through social media posts Martel did not author, the false accusation that Martel had been speeding back and forth in a city-issued vehicle while following a Braswell PD internal affairs sergeant and yelling out the window at her, and the false accusation that Martel had been intimidating other Braswell City officials; and

i. Upon information and belief, directing or permitting the systematic destruction of Martel's campaign signs throughout the City of Braswell during the mayoral campaign.

293. Such conduct was extreme and outrageous.

294. Such conduct proximately caused Martel severe emotional distress.

82

295.   Defendant Jefferson's conduct was motivated by that kind of ill will, spite, malice, and conscious indifference and reckless disregard for the consequences of his actions and for Martel's rights that justifies an award to Martel of punitive damages against them.

296.   Defendant Jefferson acted with actual malice, including with both the intent to cause Martel harm and injury and having done so with the unequivocal knowledge that Martel had not engaged in any unlawful conduct while in the exercise of his First Amendment rights, such that he is not entitled to official immunity. Defendant Jefferson acted with the intention to retaliate and to inflict harm, as opposed to having made a good faith mistake.

297.   Defendant Jefferson acted in bad faith and has caused Martel unnecessary trouble and expense, thus entitling Martel to an award of his expenses of litigation, including his attorneys' fees, pursuant to O.C.G.A. § 13-6-11.

## COUNT NINE
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
**(Against Defendant Betsill in His Individual Capacity, Defendant Kenny in His Individual Capacity, and Defendant Jefferson in His Individual Capacity)**

298.   Martel incorporates by reference paragraphs 1 through 102 of this Complaint as though set forth herein in their entirety.

299.   Defendant Jefferson directed Defendant Betsill and Defendant Kenny to issue citations to Martel to shut down the Campaign Event.

300. Defendant Betsill and Defendant Kenny abided Defendant Jefferson's direction and issued two baseless citations to Martel in connection with the Campaign Event.

301. Defendant Jefferson, Defendant Betsill, and Defendant Kenny knew there was no probable cause or arguable probable cause to cite Martel for any crime in connection with the Campaign Event.

302. The baseless charges against Martel were dismissed within 10 days of the citations being issued.

303. Defendant Jefferson, Defendant Betsill, and Defendant Kenny acted with actual malice, including with both the intent to cause Martel harm and injury and having done so with the unequivocal knowledge that Martel had not engaged in any unlawful conduct while in the exercise of his First Amendment rights, such that they are not entitled to official immunity.

304. Defendant Jefferson, Defendant Betsill, and Defendant Kenny acted with the intention to retaliate and inflict harm, as opposed to having made a good faith mistake.

305. Defendant Jefferson, Defendant Betsill, and Defendant Kenny's baseless citations proximately caused Martel to suffer damages, in an amount to be proven at trial, including mental and emotional suffering, and out-of-pocket costs.

306. Defendant Jefferson, Defendant Betsill, and Defendant Kenny's conduct was motivated by that kind of ill will, spite, malice, and conscious indifference and reckless disregard for the consequences of their actions and for Martel's rights that justifies an award to Martel of punitive damages against them.

307. Defendant Jefferson, Defendant Betsill, and Defendant Kenny acted in bad faith and have caused Martel unnecessary trouble and expense, thus entitling Martel to an award of his expenses of litigation, including his attorneys' fees, pursuant to O.C.G.A. § 13-6-11.

## COUNT TEN
## DEFAMATION
### (Against Defendant Kenny in His Individual Capacity)

308. Martel incorporates by reference paragraphs 1 through 102 of this Complaint as though set forth herein in their entirety.

309. Defendant Kenny sent a Facebook message to the Mayor of the City of Emerson falsely stating that Martel was on a Georgia Brady list and that Martel was terminated from the Braswell PD for untruthfulness.

310. Martel has never been on any Brady list, and he voluntarily resigned from the Braswell PD. Even the manufactured termination four months after his resignation was not for untruthfulness.

311. Defendant Kenny published these false and *per se* defamatory accusations without privilege.

312. Defendant Kenny knew that Martel has never been on any Brady list, and that Martel had voluntarily resigned from the Braswell PD.

313. Defendant Kenny manufactured these accusations from whole-cloth.

314. Defendant Kenny acted with actual malice as defined by *New York Times v. Sullivan*, 376 U.S. 254 (1964).

315. Defendant Kenny acted with actual malice as that term is used in the context of official immunity, including with both the intent to cause Martel harm and injury and having published the statements with knowledge of falsity; accordingly, he is not entitled to official immunity.

316. Defendant Kenny acted with the intention to retaliate and inflict harm, as opposed to having made a good faith mistake.

317. Damages are presumed because the accusations are *per se* defamatory.

318. Defendant Kenny's accusations proximately caused Martel to suffer damages, in an amount to be proven at trial, including mental and emotional suffering, and reputational injury.

319. Defendant Kenny's conduct was motivated by that kind of ill will, spite, malice, and conscious indifference and reckless disregard for the consequences of his actions and for Martel's rights that justifies an award to Martel of punitive damages.

320. Martel sent a retraction demand to Defendant Kenny regarding the false and defamatory accusations, and Defendant Kenny refused to retract them or apologize. A true and correct copy of the retraction demand is attached hereto as Exhibit A.

321. Defendant Kenny acted in bad faith and has caused Martel unnecessary trouble and expense, thus entitling Martel to an award of his expenses of litigation, including his attorneys' fees, pursuant to O.C.G.A. § 13-6-11.

## COUNT ELEVEN
## DEFAMATION
**(Against Defendant Jefferson in His Individual Capacity)**

322. Martel incorporates by reference paragraphs 1 through 102 of this Complaint as though set forth herein in their entirety.

323. Defendant Jefferson directed that the June 16, 2025, communication be sent to the Emerson PD, which included the false and *per se* defamatory accusation that Martel interfered with an accident investigation.

324. Martel did not interfere with an accident investigation as described in the June 16, 2025, communication.

325. Defendant Jefferson knew that Martel did not interfere with an accident investigation, or he published the statement with a reckless disregard for the truth.

326. Defendant Jefferson's purported source for the accusation regarding the accident investigation was an officer under his control who, upon information and belief, Defendant Jefferson directed to manufacture the false accusation.

327. Defendant Jefferson communicated the false accusation regarding the accident investigation as part of the preconceived narrative that Martel engages in professional misconduct.

328. Defendant Jefferson either viewed Polk County's footage of the accident investigation and thus had actual knowledge that Martel did not interfere with said investigation, or defendant Jefferson recklessly disregard this known source of exculpatory material that demonstrated that Martel did not interfere with the investigation.

329. Defendant Jefferson sent an email to the Emerson PD on November 7, 2025, which included the false and *per se* defamatory accusation that Martel was speeding back and forth in a vehicle that was issued to him by the City of Emerson.

330. Martel was not speeding back and forth in a vehicle that was issued to him by the City of Emerson, as described in the November 7, 2025, email.

331. Defendant Jefferson knew that Martel was not speeding back and forth in a vehicle that was issued to him by the City of Emerson, as described in the November 7, 2025, email, or he published the statement with a reckless disregard for the truth.

332. Defendant Jefferson's purported source for the accusation regarding the speeding was an officer under his control who, upon information and belief, Defendant Jefferson directed to manufacture the false accusation.

333. Defendant Jefferson communicated the false accusation regarding the Martel speeding as part of the preconceived narrative that Martel engages in professional misconduct.

334. Defendant Jefferson published these false and *per se* defamatory accusations without privilege.

335. Defendant Jefferson acted with actual malice as defined by *New York Times v. Sullivan*, 376 U.S. 254 (1964).

336. Defendant Jefferson acted with actual malice as that term is used in the context of official immunity, including with both the intent to cause Martel harm and injury and having published the statements with knowledge of falsity; accordingly, he is not entitled to official immunity.

337. Defendant Jefferson acted with the intention to retaliate and inflict harm, as opposed to having made a good faith mistake.

338. Damages are presumed because the accusations are *per se* defamatory.

339. Defendant Jefferson's accusations proximately caused Martel to suffer damages, in an amount to be proven at trial, including mental and emotional suffering, and reputational injury.

340. Defendant Jefferson's conduct was motivated by that kind of ill will, spite, malice, and conscious indifference and reckless disregard for the consequences of his actions and for Martel's rights that justifies an award to Martel of punitive damages against him.

341. Martel sent a retraction demand to Defendant Jefferson regarding the false and *per se* defamatory accusations, and Defendant Jefferson refused to retract them or apologize. A true and correct copy of the retraction demand is attached hereto as Exhibit B.

342. Defendant Jefferson acted in bad faith and has caused Martel unnecessary trouble and expense, thus entitling Martel to an award of his expenses of litigation, including his attorneys' fees, pursuant to O.C.G.A. § 13-6-11.

## COUNT TWELVE
## MALICIOUS PROSECUTION
**(Against Defendant Betsill in His Individual Capacity, Defendant Kenny in His Individual Capacity, and Defendant Jefferson in His Individual Capacity)**

343. Martel incorporates by reference paragraphs 1 through 102 of this Complaint as though set forth herein in their entirety.

344. On September 1, 2025, Defendant Betsill and Defendant Kenny, acting under color of state law and at the direction of Defendant Jefferson, issued two criminal citations to Martel at his private home: (a) a citation under Braswell Ordinance 3-58, "LICENSE PERMIT UNLAWFUL"; and (b) a citation under Braswell Ordinance 3-60, "UNLAWFUL ASSEMBLY."

90

345. The two citations initiated criminal proceedings against Martel. Each citation constituted a valid summons within the meaning of O.C.G.A. § 51-7-40 and required Martel to answer to a criminal charge in the Municipal Court of the City of Braswell.

346. The criminal proceedings initiated against Martel by the two citations terminated in Martel's favor. Both citations were dismissed within ten days of issuance, without Martel ever having to appear in court.

347. There was no probable cause for the issuance of either citation against Martel. Specifically:

    a. Braswell Ordinance 3-58 was not an active or enforceable ordinance. The City of Braswell's published ordinances described Ordinance 3-58 as "PENDING," and the ordinance contained no operative language describing any prohibited conduct or any criminal offense.

    b. Braswell Ordinance 3-60, "UNLAWFUL ASSEMBLY," prohibits "[a] disturbance of the public peace by three or more persons who meet together with an intent mutually to assist each other in the execution of some unlawful enterprise of a private nature, with force and violence." None of the elements of Ordinance 3-60 were present at the Campaign Event, which was a lawful, non-commercial, family-friendly political gathering at Martel's private home involving no disturbance of the

91

public peace, no unlawful enterprise, no intent to mutually assist in the execution of any unlawful enterprise, and no force or violence.

c. No other state, federal, or municipal law supported the issuance of the citations.

348. Defendant Jefferson, Defendant Betsill, and Defendant Kenny knew at the time of the issuance of the citations that there was no probable cause to issue either citation.

349. The absence of probable cause is further confirmed by, among other things: (a) the prompt dismissal of both citations within ten days of issuance, without Martel ever having to appear in court; (b) Defendant Jefferson's advance statement to a Polk County election official that he intended to shut down the Campaign Event, which the election official warned him would be unlawful; and (c) the obvious facial inapplicability of Ordinance 3-60 and the obvious non-existence of Ordinance 3-58.

350. Defendant Jefferson's malicious motive is further confirmed by his admitted concern that, if Martel were elected Mayor, Martel would terminate him from his position as Chief of the Braswell PD.

351. Defendant Jefferson personally directed, ordered, instigated, procured, and actively encouraged the prosecution of Martel, including by directing Defendant Betsill and Defendant Kenny to issue the two citations to Martel.

352. As the direct and proximate result of Defendant Jefferson's, Defendant Betsill's, and Defendant Kenny's malicious prosecution of Martel, Martel has suffered damages in an amount to be proven at trial, including: (a) loss of liberty during the September 1, 2025, encounter, (b) mental and emotional suffering; (c) harm to his personal, political, and professional reputation, including by virtue of the public record of the citations and the proceedings; (d) interference with his First Amendment-protected political campaign; and (e) out-of-pocket costs.

353. Defendant Jefferson, Defendant Betsill, and Defendant Kenny acted with actual malice and with the deliberate intent to cause Martel harm and injury. Each Defendant acted with the unequivocal knowledge that Martel had engaged in no unlawful conduct and that there was no probable cause to issue the citations against him. Defendants did not act in good faith or under any reasonable mistake of fact or law; they acted with the deliberate intent to retaliate against Martel for his exercise of his First Amendment rights and to suppress his protected political activity.

354. Defendant Jefferson's, Defendant Betsill's, and Defendant Kenny's conduct was motivated by that kind of ill will, malice, and conscious indifference and reckless disregard for the consequences of their actions and for Martel's rights that justifies an award to Martel of punitive damages under O.C.G.A. § 51-12-5.1 against them.

355.   Defendant Jefferson, Defendant Betsill, and Defendant Kenny acted in bad faith and have caused Martel unnecessary trouble and expense, thus entitling Martel to an award of his expenses of litigation, including his attorneys' fees, pursuant to O.C.G.A. § 13-6-11.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Remi Martel respectfully petitions this Honorable Court for the following relief:

a)  That Summons and Process issue as provided by law;

b)  That Martel be granted a trial before a jury of his peers;

c)  That Martel be granted judgment and all appropriate damages against all Defendants, including compensatory damages, punitive damages, and expenses of litigation, including costs and attorneys' fees; and

d)  For such other and further relief as the Court may deem just and proper.

Respectfully submitted this 14th day of May, 2026.

/s/Jonathan D. Grunberg
Jonathan D. Grunberg
Georgia Bar No. 869318
WADE, GRUNBERG & WILSON, LLC
3100 Cumberland Blvd, SE, STE. 1130
Atlanta, Georgia 30339
jgrunberg@wgwlawfirm.com
404-600-1153

*Counsel for Plaintiff Remi Martel*

94

## CERTIFICATION UNDER L.R. 7.1D.

Pursuant to Northern District of Georgia Civil Local Rule 7.1D, the undersigned counsel certifies that this COMPLAINT is a computer document and was prepared in Times New Roman 14 point font, as mandated in Local Rule 5.1C.

This 14th day of May, 2026.

*/s/Jonathan D. Grunberg*